UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America et al.,<br><br>                    Plaintiffs,<br><br>-against-<br><br>Live Nation Entertainment, Inc. and<br>Ticketmaster L.L.C.,<br><br>                    Defendants. | 24-cv-3973 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

This is an antitrust suit brought by the federal government, the District of Columbia, and a host of states (collectively "the government") against Live Nation and Ticketmaster (collectively "Live Nation"). The government alleges that Live Nation has violated antitrust laws across six different markets in the live-music industry. After 15 months of discovery, Live Nation moved for summary judgment on the government's claims. The Court GRANTS in part and DENIES in part Live Nation's motion for summary judgment. Three sets of claims will proceed to trial. The first is comprised of the government's federal and state claims related to the market for large amphitheaters, in which Live Nation's venues and its promotions business are alleged to have engaged in tying. The second is comprised of the venue-facing ticketing market, in which Ticketmaster takes center stage. And the third is comprised of the state claims that aren't subject to dismissal based on the resolution of the federal claims. The Court further GRANTS in part Live Nation's motion to exclude some of the testimony of the government's economic expert, Dr. Nicholas Hill.

## BACKGROUND

Over the last three decades, Live Nation has grown from a small concert promoter into an entertainment powerhouse. As of late 2024, Live Nation produces 54,000 events per year globally and owns, operates, has exclusive booking rights, or has an ownership stake in 394 venues across the world. Live Nation Entertainment, Inc., *Annual Report (Form 10-K)* at 2 (Feb. 21, 2025). Its expansion was not without controversy. Its 2010 merger with Ticketmaster was allowed only under a consent decree that required divestment of some business lines and barred Live Nation from retaliating against venues that did business with Ticketmaster's competitors. Dkt. 799 ¶ 38. Nonetheless, Live Nation continued to grow.

Today, Live Nation is involved at almost every stage of an event's life. It offers promotion services to artists, owns or operates its own venues, and sells tickets directly to fans. That means that Live Nation is involved up and down the supply chain for live entertainment across multiple different markets. These bear some explanation.

Starting at the beginning, artists who want to play a show or go on tour typically work with a promoter. Dkts. 717-1 ¶ 28; 717-3 ¶¶ 30–32. Promoters play two roles. The first is operational: They market the artists' shows or tours to the public. They're how you or I learn that there's a show happening, who's playing, and where. Second, and less obviously, they absorb financial risk. Promoters typically pay artists large lump-sum payments in exchange for the rights to promote their shows. The artist's risk is reduced or eliminated—they're paid something regardless of how many tickets are sold. Dkts. 717-1 ¶ 31; 717-3 ¶ 32. The promoter holds that risk instead. Dkts. 717-3 ¶ 36; 791-2 ¶ 49. Then, if the profits exceed the amount due to the artist, the remainder is usually split between artist and promoter, with the promoter's share compensating them for their work and for shouldering risk. Dkt. 717-1 ¶ 31. In this market, promoters compete to attract artists. And they do so based on how much money they can guarantee, the split of the profit, and their ability to get the artist into desirable venues. *Id.* ¶ 32.

The latter is possible because promoters contract with the venues. Dkts. 717-1 ¶ 36; 717-3 ¶ 35. The venues are exactly what you would expect—the auditoriums, concert halls, theaters, amphitheaters, and stadiums in which artists play their shows. Venues are in charge of running the events. The owner, a lessee, or a hired management company takes care of the physical premises and arranges security, parking, food and drinks, and other logistics. Dkts. 717-1 ¶¶ 41, 43; 717-3 ¶ 39. In exchange for those services, they charge rent for using the space and additional fees for other costs (like hiring stagehands). Dkts. 717-1 ¶¶ 41, 43; 717-3 ¶ 40. But that isn't the end of the arrangement. Venues also pay promoters in exchange for booking their artists with the venue. That payment might be tied either to the number of tickets sold or to the number of shows promoted, or it could instead be an agreement to split some of the costs and revenues. Dkts. 717-1 ¶ 36; 717-3 ¶ 40. The bottom line is that these deals vary significantly, not only in payment but also in their other terms—for example, by length (show-by-show or long term) and by exclusivity (granting the promoter the *sole* right to promote concerts at a venue or not). Dkts. 717-1 ¶ 37; 717-3 ¶ 40. Once these deals are hammered out, the next step is to bring the concert to the fans.

Enter ticketers. Venues contract with companies that operate ticket-sales platforms, usually on a smartphone app or a website. Dkts. 717-1 ¶ 45; 791-2 ¶ 54. The ticketers sell directly to fans. They also provide a range of support services, including hardware to scan tickets and software that venue staff can use to track ticketing-related information. Dkts. 717-1 ¶ 48; 791-2 ¶ 54. The ticketers that offer more support—for example, hands-on event staffing, physical devices, and even marketing—are called "full service" ticketers. Dkt. 717-1 ¶ 49. Those who offer less—for example, just digital tickets and online-only services—are called "self-service" ticketers. *Id.* These arrangements are complex. Ticketers typically pay the venue in exchange for the (usually exclusive) right to sell tickets on their behalf over multiple years. Dkts. 717-1 ¶¶ 53–57; 791-2 ¶¶ 58, 60 (describing the forms that this payment can take). On top of that, the ticketer returns a large portion of the fees from the fans to the venue. Dkts. 717-1 ¶ 64; 791-2 ¶ 59. This leaves the contract looking a bit like that between the artist and the promoter. The venue (like the artist) gets an up-front payment plus some split of the profits; the ticketer (like the promoter) gets what's left over. The result is similar: The ticketer shoulders some of its counterparty's risk. Dkt. 791-2 ¶ 61.

To pick a ticketer, venues start by issuing a request for proposals that describes what they're looking for. Dkts. 717-1 ¶ 51; 791-2 ¶ 76 n.18. Ticketers then compete for the contract by submitting proposals describing not only the services they can offer, but also how much money they're willing to pay the venue up front to win the contract. Dkts. 717-1 ¶ 51; 791-2 ¶ 62. Of course, if they already have a contract with a ticketer, they may simply renew it before it expires, dodging that whole process. Dkt. 717-1 ¶ 52.

Finally, the tickets are sold to the fans. When fans buy tickets, they pay the "all-in price," which bakes in layers of fees and pre-negotiated payments. The all-in price has two parts: the "face value of the ticket" and the "outside fees." Dkts. 717-1 ¶ 59; 791-2 ¶¶ 73, 77. The outside fees are the fees that a fan sees on the ticketing platform—it's what goes to the venue and to the ticketer and it's typically decided by those two parties. Dkt. 717-1 ¶ 61. The remaining part of the price— the face value—is set initially by the artist and promoter, but may be higher because of dynamic pricing applied by the ticketer. *Id.* ¶ 60. It also includes what's called an "inside fee," a charge that isn't disclosed to the fan and is baked into the face value. *Id.* ¶ 62; *see also* Dkt. 791-2 ¶ 51 n.54 (relying on the same definition).

Live Nation operates across all these markets. It describes itself as a "vertically integrated company comprised primarily of its promotion business (Live Nation), its venue ownership and operation business (Venue Nation), its sponsorship business (Sponsorship & Advertising), and its ticketing business (Ticketmaster)." Dkt. 689 at 21. Live Nation offers every service in the chain described above save—for now, perhaps—the job of the artists themselves. An artist can hire a Live Nation promoter to play at a Live Nation venue that sells its tickets using Ticketmaster, a Live Nation company. This isn't unique; one of Live Nation's biggest competitors is also vertically integrated. Dkt. 696-10 at 11:2–3, 12:1–13:9. But it creates opportunities for the company to act strategically across markets. For example, Live Nation has a policy against renting its amphitheaters out to other rival promoters. Dkt. 755 at 13–14; January 23, 2026 Hearing Tr. 33:12–21.

In 2024, the Department of Justice and the attorneys general for 39 states plus the District of Columbia sued Live Nation for antitrust violations under Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1–2; Dkt. 1. They also sued Live Nation under at least 40 state and local laws. As to the federal claims, the complaint alleges that Live Nation is a monopolist in six markets, hurt competition in those markets, and engaged in anticompetitive behavior up and down the live-event industry. Dkt. 257 ¶¶ 224–64. The six markets that the government identifies track the description above. They are:

- A market for promotion services in which the artists are the consumers and Live Nation's promotion service is the monopolist. Dkt. 257 ¶ 258;
- A market for venues in which the artists are the consumers and Live Nation's large amphitheater venue service is the monopolist. *Id.* ¶ 250;
- A market for concert-booking services in which the venues are the consumers and Live Nation's promotion service is the monopolist. *Id.* ¶ 258;

- Two markets for primary ticketing services, in which the venues are the consumers and Live Nation's ticketing service is the monopolist. *Id.* ¶ 225; and
- A market for primary ticketing services in which the fans are the consumers and Live Nation's ticketing service is the monopolist. *Id.*

After a two-year government investigation and 15 months of discovery, Live Nation moved for summary judgment. As to the monopolization claims, it argues that: (1) the government's markets are improperly defined (and that Live Nation lacks market power in any properly-defined market), (2) the government has no evidence of anticompetitive effects of Live Nation's conduct, and (3) the states lack antitrust standing to seek damages on behalf of their consumers. Live Nation also raises separate challenges to the government's non-monopolization exclusive-dealing and tying claims. In connection with Live Nation's summary-judgment motion, it also seeks to exclude some of the testimony offered by the government's economic expert, Dr. Nicholas Hill.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the proponent of expert testimony must show that the "witness . . . is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent must also demonstrate that it is more likely than not that the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." *Id.*; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("[Rule 702] incorporates principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Supreme Court charged trial courts with a gatekeeping role to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" (footnote omitted) (quoting *Daubert*, 509 U.S. at 589)).

## DISCUSSION

Under both Section 1 and Section 2 of the Sherman Act, "a plaintiff must allege a plausible relevant market in which competition will be impaired." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). That exercise is called market definition. The market definition is used to assess market power, which is relevant both to Section 2 (which applies to monopolization) and to Section 1 (which applies to agreements that unreasonably restrain trade). *Geneva Pharms.*

*Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495, 506 (2d Cir. 2004). Market power is the cornerstone of a Section 2 claim. "To establish a violation of § 2, plaintiffs must prove that defendants possessed monopoly power, and willfully acquired or maintained that power in the relevant market." *Id.* at 495. By contrast, Section 1 doesn't strictly require a showing of market power. It instead requires a plaintiff to show "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Id.* at 506. While an unreasonable restraint of trade may be shown by market power, "[d]irect evidence of anticompetitive effects … obviates the need for a detailed market analysis or showing of market power." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 117 (2d Cir. 2021); *accord K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995).

Live Nation argues that the government failed to properly define any market, that it lacks sufficient market power once those markets are properly defined, and that there's no genuine dispute of material fact about any anticompetitive conduct.

## I.    Market definition, market power, and the Sherman Act

"For antitrust purposes, the concept of a market has two components: a product market and a geographic market." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). The general inquiry is to identify a set of "products that have reasonable interchangeability for the purposes for which they are produced," (the product market) and then to identify "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product" (the geographic market). *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (first quotation); *Concord Assocs.*, 817 F.3d at 53 (second quotation) (quotation omitted). The foundational idea is that "a market is the arena within which significant substitution in consumption or production occurs." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 530a (5th ed. 2025). "The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms.*, 386 F.3d at 496. Put differently, if many customers don't see much of a difference between the products of two companies (say, Coca-Cola and Pepsi), then if the price of Coca-Cola were to rise by a small but significant amount (say, 5% or 10%), many customers would switch to Pepsi, even though "individual customers may have enthusiastic preferences for one of them or the other." Areeda & Hovenkamp ¶ 913a.

"[T]here is no requirement to use any specific methodology" to define a market. *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 n.8 (2d Cir. 2024). But the Second Circuit has endorsed two approaches: the *Brown Shoe* factors and the hypothetical monopolist test (HMT). *Id.* at 340–41 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) and *United States v. Am. Express Co.*, 838 F.3d 179, 199 (2d Cir. 2016)). Under *Brown Shoe*, courts are instructed to consider "such practical indicia as industry or public recognition of the []market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at

325. These factors are "evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).

By contrast, the HMT is designed to provide direct proof of substitutability. It relies on the critical insight that "a market can be seen as the array of producers of substitute products that could control price if united in a hypothetical cartel or as a hypothetical monopoly." Areeda & Hovenkamp ¶ 530. From there, experts can analyze whether a hypothetical monopolist in a proposed market could turn a profit by persistently "worsening … terms" for its customers on one of its products (by raising prices or reducing quality) by a small but significant amount. DOJ & FTC Merger Guidelines § 4.3.A (2023). Some customers would continue to purchase the product (the Coca-Cola loyalists), others would leave for other products also sold by the same hypothetical monopolist (like Pepsi), and some others would buy a product outside of the soda market (and drink milk). If the "incremental profits from the increased price plus the incremental profits from recaptured sales going to other products in the candidate market exceed the profits lost when sales are diverted outside the candidate market," then the price increase is profitable. *Id.* at § 4.3.C. In other words, if enough of the switchers pick Pepsi instead of something further afield like milk, then a hypothetical monopolist would make money (depending on its margins). And if it's profitable, that supports the conclusion that the candidate market indeed consists of the set of products that consumers see as highly substitutable for one another. *Id.*; *see also* Areeda & Hovenkamp ¶ 536. The bottom line is that this is a way to put some numbers onto whether two products are reasonably interchangeable. That's the case when "there is sufficient cross-elasticity of demand— that is, where consumers would respond to a slight increase in the price of one product by switching to another product." *Regeneron*, 96 F.4th at 339 (internal quotations omitted).

With all that said, the Court can get to the markets that the government has proposed. The government proposes six relevant antitrust markets. Five of them turn on the same concept: a market for some service in connection with "major concert venues" nationwide. The idea is that there's a particular *type* of concert associated with this category of venue, maybe because of the artists that they attract, or some other factor. That segmentation shows up in how artists book promoters, how promoters deal with venues, and how venues contract with ticket sellers. On that view, Live Nation has a chokehold on the provision of concerts at these venues. The final market is a market for booking large amphitheaters (a type of venue), between the amphitheaters and the artists. Like with the first five markets, the government says that Live Nation's market share here is enormous.

Each potentially relevant market and claim must be analyzed individually. The Court begins with whether there's a genuine dispute of material fact about whether these markets are properly defined, beginning at the top of the live-event supply-chain with the markets involving the artists. The government hasn't proposed any alternative markets, so summary judgment is warranted on claims stemming from any proposed market that isn't well-defined.

## II.    The artist-facing markets

Start with the beginning of the chain of events described earlier—when an artist finds a promoter. The government proposes two relevant antitrust markets in which the artists are harmed by

6

Live Nation. The first is a market for promotion services sold to artists for events that take place in "major concert venues" nationwide. Dkt. 257 ¶ 258. The second is a market in which artists book major concert amphitheaters.

### A.  The market for promotion services at MCVs

"Major concert venue" is a term of art in this case. Because it's defined in a technical way that may not track its lay meaning, the Court will follow the parties' lead and refer to these venues from here on as MCVs. The government defines an MCV as (1) an arena or large amphitheater, with (2) a capacity of 8,000 or more, that (3) hosted ten or more concerts in at least one year between 2017 and 2024. Dkts. 755 at 17; 763 ¶ 3. Live Nation responds that this is "gerrymandering" because it excludes stadiums, smaller amphitheaters, and large theaters; once these are included, Live Nation says, its market share is much lower. Dkt. 689 at 16. The Court turns to the *Brown Shoe* factors and the HMT to parse that debate.

#### 1.  Brown Shoe

The government argues that three of the *Brown Shoe* factors together support a market for promotion services linked to MCVs.

*Industry recognition*. In its brief, the government pointed to five categories of evidence: (1) a Live Nation internal email that purportedly "categorizes and analyzes tours based upon major concert venues," Dkt. 774-1 ¶ 155a; (2) internal presentations that categorize promotion by venue type (not grouped into an MCV category), *id.* ¶ 155b; (3) internal analysis of promotion market share broken down by venue type (again, not grouped into an MCV category), *id.* ¶ 155c; and (4) commentary by competitors in the promotion market suggesting that Live Nation is a dominant player in promoting national tours, *id.* ¶ 155d. But none of the government's evidence is relevant to its proposed market definition. Recall that the proposed market is one for promotion services for a subset of venues that includes arenas and large amphitheaters but excludes other types of venues (and the proposed market has explicit capacity and show-frequency thresholds). Every piece of evidence cited here by the government instead supports only the trivial conclusion that Live Nation and other market players often discuss promotion services in reference to *some* kind of venue, not the specific set that the government has proposed.

The sole pieces of relevant evidence that the Court could identify suffer from the same problem. The first is an internal presentation in which Live Nation noted that its market share increases linearly with venues that put on more shows. Dkt. 757-34 at 7. The second and third are statements made by competitors saying that Live Nation dominates market share for national tours. Dkts. 757-33 at 5, 23; 696-4 at 58:18–59:25 But this isn't probative evidence because it depends on market share (which is calculated based on a market definition) to support market definition (which will then be used to calculate market share). This evidence might support the geographic scope of any properly defined product market being national, but that's it.

Otherwise, the rest of the evidence that the government cites undercuts its proposed definition. Many of these communications discuss venues like "arenas" and "large amphitheaters" (that the

government argues are linked) as *separate* categories; and they discuss venues like "boutique & large indoor" venues (that the government argues are separate) as *consolidated* categories. Dkts. 841-15; 835-36; 841-17; 757-34. So this factor doesn't support the government's market definition.

*Distinct customers, prices, or sensitivity to price changes*. Start with distinct customers. The government argues that there's a distinct group of artists who perform at major concert venues—what makes them distinct is their "levels of popularity" and "strong preferences for performing in such venues." Dkt. 774-1 ¶ 157. The government then alleges that they pay distinct prices for promotion services, with different deal structures than other artists face. *Id.* ¶ 158. It points the Court to the report of its economic expert Dr. Nicholas Hill as well as depositions of industry insiders. Hill's analysis suggests that the artists who play at MCVs are on average less popular than those who play at stadiums (measured either by monthly Spotify listeners or whether they're on the Billboard weekly top 100 list), and more popular than those that play at smaller venues. Dkt. 717-1 ¶¶ 161–164. And the deposition testimony explains that artists don't like to play a venue that they can't fill, so less popular artists won't want to play in a half-empty stadium. Dkts. 695-28 at 38:10–14 ("if they're popular, you play the bigger ones" while "if they're less popular" they "play the smaller venues"); 706-7 at 108:12–14 ("if you have an act that can only fill, you know, 2–3,000 seats, that's more suited for, like, a smaller venue"). This provides support for drawing lines based on venue capacity. But it's an incomplete picture without more information about the product at issue here: promotion services. How do promotion services for MCVs differ from other kinds of promotion services?

The government tries to answer that with evidence of distinct prices. It alleges that there are three differences between the promotion deals at MCVs and other venues: (1) "[p]romoters often earn a percent of the artists' earnings," Dkt. 774-1 ¶ 158a; (2) "[s]hows at major concert venues command differentiated prices for promotion services," *id.* ¶ 158b; and (3) "[t]he inputs or proxies for price—like guarantees per show, bonuses, and expenses—vary for major concert venues," *id.* ¶ 158c. Each of these distinctions mischaracterizes the evidence. First, the government mistakenly relies on an internal Live Nation document that describes deal structures between promoters and venues, not promoters and artists, and discusses large versus small *markets*, not *venues*. Dkt. 752-9 at 8–11. Second, the government's evidence for differential pricing consists entirely of a statement made during a deposition of a Live Nation vice president in which he testified that events have "variable expenses," and so the costs of production scale with size. Dkt. 749-12 at 27:15–28:10. Again, the government doesn't explain why that leads to "differentiated prices for promotion services" *as paid by artists* or provide any direct evidence of that, much less tie that to its MCV definition. Third, the cited documents don't treat MCVs as any coherent category and, like so many of the other cited documents, instead treat the venues included in the MCV definition separately. Dkts. 750-6 at 13–14 (different deal terms apply to amphitheater and arena tours); 750-11 at 5 (same). All in all, there's some evidence that the artists who play in MCVs are more popular than those who play in smaller venues and less popular than those who play in stadiums—but, beyond that, the government hasn't pointed to any evidence that artists in the promotion market

for MCVs are otherwise distinct in any way. This factor provides the faintest support for the government's proposed market.

*Specialized vendors*. Here, the government relies on deposition testimony from industry insiders to establish that "there are only a subset of promoters with the requisite experience, capital, and ability to secure artists' access to major concert venues." Dkt. 774-1 ¶ 156. Again, though, none of this testimony mentions MCVs at all. Read generously, the depositions provide reasons why promotion for large events requires scale and relationships, suggesting that promoters for big venues are specialized insofar as they're also big, able to pay big guarantees, and well-networked. Dkts. 757-32 at 41:17–42:10, 42:24–43:9; 695-28 at 136:14–140:16, 141:5–142:3, 146:2–148:4; 696-16 at 84:16–85:10. That may be true, but the government doesn't propose a market of "promotion for big venues." It proposes a market for MCVs that lops off some of the larger and smaller venues, based either on venue type or on audience capacity. Why are those thresholds correct? Do large theaters work so differently? What about stadiums? Of course, any threshold will be arbitrary in some way; but the government's evidence must at least be *relevant* to the thresholds that they've drawn.

Taken together, the *Brown Shoe* factors don't indicate that there's a triable issue of fact over a relevant antitrust market for promotion services at MCVs sold to artists.

### 2. The HMT

Next, the Court considers the quantitative evidence submitted by the government in the form of the hypothetical monopolist test. The government claims that "Hill's HMT, using three different underlying methodologies, finds it would be profitable for a hypothetical monopolist to impose a [small but significant and non-transitory increase in price] in the promotion services market." Dkt. 755 at 20. That testimony is the subject of a *Daubert* motion filed by Live Nation. Dkt. 715.

Under Federal Rule of Evidence 702 and *Daubert*, the proponent of expert testimony must show that it's more likely than not that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed R. Evid. 702(a)–(d); *accord Daubert*, 509 U.S. at 588–94 (1993). Live Nation argues that Hill's report fails the fourth prong of Rule 702: He didn't reliably apply the principles and methods that he described to the facts of the case. Fed R. Evid. 702(d). The Court agrees. To understand why, some explanation of what Hill did is needed.

Hill begins by laying out a method of the HMT, the aggregate diversion test. Dkt. 717-1 ¶¶ 97–102. As a reminder, the HMT is a measure of whether it would be profitable for a hypothetical monopolist in a proposed market to impose a SSNIP (small but significant non-transitory increase in price) on a product in the market. If so, that would support the market definition.

The nuts and bolts of the analysis involve first calculating the "critical" aggregate outside diversion ratio, which is "the maximum percentage of lost customers who could switch to an option

outside the candidate market that would still allow the hypothetical monopolist to profitably impose a given price increase." *Id.* ¶ 101. This is a function of the defendant's profit margin and the size of the price increase. *Id.* Then, you calculate the *actual* aggregate outside diversion ratio—"the percentage of lost customers that would actually switch to an option outside rather than inside the candidate market" after a SSNIP. *Id.* If the percentage of lost customers that switch out of the market is lower than the breakeven point for profitability, then a candidate market isn't too narrowly defined. *Id.* If the percentage of lost customers that switch outside of the market is greater than that breakeven point, the market *is* too narrowly defined because it isn't capturing a product that consumers treat as a substitute. *Id.*

Live Nation doesn't quibble with any of that. Its problem is with its application. Hill's analysis relies on his estimate of how many customers would switch outside versus inside the market after a SSNIP. To calculate that estimate, he looked at "where artists performed following an appearance at a major concert venue." *Id.* ¶ 171. On this view, diversion would happen outside the market "if an artist follows a performance at a major concert venue with a performance that is not at a major concert venue." *Id.* He finds that this happens 28% of the time. *Id.* ¶ 172. When he plugs that input into the rest of his calculations, it passes the hypothetical monopolist test. *Id.* ¶ 173. As Live Nation argues, this approach bears little resemblance to the methodology that Hill laid out.

The core issue is that Hill's analysis isn't a reasonable measure of economic substitution. The hypothetical monopolist test turns on the consumer reaction to a worsening of terms on one product, for example through a price hike or a decrease in quality. Hill's estimated ratio is measuring something different. Whether an artist follows up a show at one type of venue in one city with a show at a different one in *another* city may simply depend on what types of venues are on offer in each locale. That doesn't measure anything concerning any particular MCV, let alone anything to suggest the artist's reaction to a price hike or worsening of terms for that MCV. Instead, it just says where artists go next—a different venue, possibly in a different city. Absent further support in the record, it isn't related to economic substitution and the cross-elasticity of demand.

Additionally, as Live Nation points out (and the government doesn't refute), venues are typically booked all at once as part of a tour, not one-by-one sequentially. That disrupts any analogy to a situation in which a customer is "switching" between two products, like buying either Coca-Cola or Pepsi each time you go to the grocery store. That's because when an artist moves from one venue to the next, they aren't deciding which kind of venue to play in next. That was all decided long ago. Further compounding the problems, this isn't an apples-to-apples comparison. Venues are unique locations with unique characteristics, and some cities may not *have* some types of venues (or a preferred venue might be booked out). Putting that all together, the order of a tour isn't a viable analogy to a consumer "switching" decision.

In his rebuttal report, Hill reprises his approach and offers two alternative measures, each allegedly modeled on the calculations of Live Nation's expert, Dr. Ali Yurukoglu. The first of these is what Hill calls a "corrected show-weighted" estimate. He calls the second a "monthly persistence" estimate. The show-weighted estimate was calculated by looking at where artists who performed shows at MCVs also performed during the same season and calculating the total portion

played at each type of venue. Hearing Tr. 89:11–21. He then weighs the artists who play at MCVs more often more heavily than those who play less often. Dkt. 717-1 ¶ 50. The monthly persistence estimate is a modification of the show-weighted estimate that looks only at where the artist performed in the single month after a show at a large amphitheater. As a result, it's a combination of the order-of-shows approach and the show-weighted approach and its validity largely rises and falls with the other two methods. The problem for the government is that this new "show-weighted" method suffers from the same core problem as the order-of-shows method: It isn't an analogue to the consumer switching decision that's relevant here.

Hill's show-weighted measure looks at where artists play in aggregate. Analyzing where somebody shops in aggregate might make a lot of sense in a retail market. But retail markets work very differently from concert tours. As Yurukoglu pointed out at the summary-judgment hearing in this case, when analyzing a retail market, "you're seeing the same customer face the same choice over and over." Hearing Tr. 102:19–20. Most readers should be familiar with that setup. When buying groceries each week for your family, you might ask: "Do we go to Costco? Do we go to Safeway? Do we go to Whole Foods?" *Id.* at 102:21–22. That's a "consistent, stable choice set," that facilitates analyzing all the potential choices to get an estimate of diversion (under some assumptions, Yurukoglu was careful to clarify). *Id.* at 102:23. But that decision-making process doesn't generalize to booking concert venues on a tour. Today you might perform in an amphitheater in New York; tomorrow, you'll be in Philadelphia. The options in Philadelphia are different from the ones available in New York. Looking at the choices made in aggregate across locations doesn't tell you anything about an artist's decision-making process in a *single* location. That's why the government's two examples in which this method has been used to estimate diversion are inapt—they're both examples of analyzing retail markets. *FTC v. Kroger Co.*, 2024 WL 5053016, at *13 (D. Or. Dec. 10, 2024); Daniel S. Hosken & Steven Tenn, *Horizontal Merger Analysis in Retail Markets* (Jan. 19, 2015).

The show-weighted analysis then suffers from another fatal flaw. Hill explicitly gives greater weight to artists who play more often at MCVs. Dkt. 717-2 ¶ 50. Hill justifies this by saying that it's designed to emphasize the marginal consumer, those who are most likely to switch away in reaction to a price increase. In his words, it "implicitly assumes that the more an artist performs at a [venue], the more likely it is that the artist is a marginal customer." Dkt. 717-2 ¶ 35. This assumption flies in the face of common sense. It posits that the people who use the product the most are the most likely to switch. And consider the inverse: Hill's reasoning posits that the customers who use the product *least* (and instead use other products) are the most likely to stick with it. This bears no resemblance to reality. It's that ambivalent soda drinker who equally enjoys Coca-Cola and Pepsi who's more likely to switch to Pepsi in reaction to a price increase in Coca-Cola, not the staunch Coca-Cola loyalist. Dkt. 717-4 ¶ 54.

As a last defense, the government argues that the data it has isn't perfect, and so it's entitled to some leeway. After all, "[d]ata recording actual customer responses to price changes is frequently unavailable, so a categorical rule requiring such data would be unrealistic." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 569 (9th Cir. 2024). But that doesn't green-light any approach under the sun.

11

Critically, in every one of the government's cited cases, the data approximated a customer *switch* or *decision* between products, even if it wasn't in reaction to a price increase. *See, e.g., FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 448 (S.D.N.Y. 2024) (relying on survey data of customers who were asked which other brands they were considering when making their purchase); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32, 54–55 (N.D. Cal. Jan. 8, 2014) (relying on data generated when defendant either "won" or "lost" business that identified who the "competitive alternative" considered by the client was); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 57 (D.D.C. 2018) (relying on "win-loss data"); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 62 (D.D.C. 2011) (relying on "highly reliable" data generated by the IRS with an "enormous" sample size that showed which competitors customers switched away to from the defendant); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 35–36 (D.D.C. 2015) (relying on three different datasets, two that were constructed from RFP and bidding information that tracked historical auction dynamics, and a third that was based on win/loss data).

The best of these cases for the government is likely *H&R Block*, as it didn't involve anything like direct win-loss data and used only a single data source. But the *H&R Block* data still closely approximated head-to-head competition, as it involved an *exclusive switch*; Hill's data, by contrast, isn't exclusive because it's about where an artist plays *next* or where they play in *aggregate*. Consider what data would be more closely analogous in this case: It might involve analyzing instances in which artists play at an MCV in a city with both an MCV and other venues and then *return* to that city later on another tour. Do the artists stick with the MCV, or instead go with the other kind of venue? Or how about a simple survey of artists, asking them directly about whether they would opt for other venues if MCV prices shot up? Perhaps this data would be hard to obtain, or maybe fruitless for other reasons—but it would be a lot closer to measuring something relevant to consumer switching.

For these reasons, the Court excludes Hill's HMT opinion on this market.[1] But even if Hill's HMT opinion were proper and admissible, its scope is quite limited. At best, Hill addresses only the preferences that artists may have for certain types of venues—MCVs versus non-MCVs. But recall that the market that the government proposes isn't one between artists and venues. It's one between artists and promoters. Even if Hill had managed to conclusively establish that artists have a durable preference for MCVs, the government has failed to connect the dots between those preferences and some MCV-specific market for promotion services.

As neither the *Brown Shoe* factors nor the HMT supports a relevant antitrust market of promotion services at MCVs, the claims based on that market are dismissed.

---

[1] Live Nation has also moved to exclude Hill's HMT because it uses the wrong denominator. Hill purports to have corrected this problem and says that his corrected measure doesn't yield a materially different number. The Court doesn't reach this issue because it instead excludes Hill's HMT based on its method of calculating the outside diversion ratio.

### B.  The market for the use of MCAmps

Next is the proposed market between artists and a subset of venues—not MCVs, but the smaller group of "Major Concert Amphitheaters" (MCAmps). These are amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. Dkt. 717-1 ¶ 139. Amphitheaters are outdoor venues that are typically used during the warmer months. *Id.* ¶¶ 141, 280. Live Nation's view is that this market incorrectly excludes "similarly sized arenas or stadiums." Dkt. 689 at 15.

This isn't the first time that a federal court has addressed a market like this. The government's proposed market closely resembles the one proposed in *It's My Party v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (analyzing market for "major amphitheaters" with "a capacity of 8,000 or more" that "actually sell 8,000 or more tickets, and [are] in use only from May to September"). There, the Fourth Circuit affirmed the district court's grant of summary judgment to Live Nation because the venue market was drawn too narrowly, excluding "clubs, arenas, stadiums, and other venues." *Id.* Live Nation argues that this problem persists in this case. The government responds that the problem in *It's My Party* was that "the plaintiff did not present evidence sufficient to rule out 'potentially reasonable substitute venues within the vicinity,'" Dkt. 755 at 23 (quoting *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 486–88 (D. Md. 2015)). By contrast, it says, it's "offer[ed] exactly this type of evidence." *Id.* at 24. The government is right. The holding of *It's My Party* isn't a pronouncement of what is or isn't a market as a universal conclusion. Instead, it's an adjudication of a dispute between two parties that, as with any case, depended on the evidence presented. And this time around, the government has better evidence.

#### 1.  Brown Shoe

The *Brown Shoe* factors support a few conclusions about MCAmps: that it's common to consider amphitheaters of this size as a category, that amphitheaters have different physical characteristics from other types of venues (and so shows are set up a bit differently), and that there's a good number of artists who really like playing shows at amphitheaters. Taken together, the evidence supports the reasonable inference that there's sufficiently inelastic demand for MCAmps *specifically* such that there's a genuine dispute of material fact as to whether this is a relevant antitrust market.

*Industry recognition.* The story starts with industry recognition. The government's evidence for industry recognition establishes that Live Nation and other promoters often use the phrase "large" or "major" amphitheater to pick out this type of venue. Dkt. 763 ¶¶ 162a–c, 163. This distinguishes both smaller amphitheaters and other types of venues, which are often considered a different business line. This is evidence that people in the industry tend to use a phrase to pick out large amphitheaters, and the appropriate inference that can be drawn from it is based on the "assum[ption] that the economic actors usually have accurate perceptions of economic realities." *Todd v. Exxon Corp.*, 275 F.3d 191, 2015 (2d Cir. 2001) (quotation omitted) The natural follow-on question is what those economic realities are.

13

*Peculiar characteristics.* The economic realities that might distinguish amphitheaters are based on their peculiar characteristics. The government's argument is that concerts at amphitheaters are simply different from those at other venues like arenas. The biggest difference between an amphitheater and an arena is that an amphitheater show is outdoors, not indoors, "typically with a permanent stage, fixed seats, a lawn, and seating for thousands." Dkt. 799 ¶ 24. Because they're outside, they can provide a different atmosphere. *Id.* ¶ 25. They're typically designed for concerts rather than for sports. *Id.* ¶ 169. And they typically lack an anchoring tenant as a result (like a local sports team). *Id.* ¶ 170. This is all well-taken, and the question is how it cashes out in terms of artists' cross-elasticity of demand—do these characteristics drive artists' decisions?

*Unique production facilities.* Evidence suggests that the peculiar characteristics create switching costs for artists, affecting the cross-elasticity of demand. The government argues that putting on a show at a large amphitheater differs from doing so at an arena. And that sometimes these differences can drive artists to avoid arenas because their production is "built for" amphitheaters. Dkt. 762-22 at 3. Of course, it isn't impossible to retool your tour—there's evidence that "you can play arenas in an amp tour," and "usually would normally—because we don't have amps in all the major city centers." Dkt. 694-13 at 44:9–12. As a result, "most amphitheater tours will have … four or five [locations] on them that they're playing arenas." *Id.* at 45:5–7. Drawing all reasonable inferences in favor of the government, switching from an amphitheater to an arena isn't costless, and it may not be preferred, but it happens nonetheless, perhaps out of necessity.

*Distinct customers and sensitivity to prices.* But might artists not want to switch to an arena, even if it were costless to do so? That could be the case if artists have highly inelastic demand for amphitheaters *specifically*. The government identifies testimony and evidence supporting that some artists have strong preferences to play in amphitheaters. Here are some examples: (1) deposition testimony from a Live Nation employee recognizing this preference, Dkt. 695-12 at 50:12–14 ("There are so many artists that love to play outdoors in the summer and love to play our amphitheaters."); (2) an internal email that states that "[m]any of the Non-Superstar Artists have predetermined to play Amps when we make the call," and suggesting that Live Nation "should be able to negotiate favorable deals there," Dkt. 750-15 at 2; (3) statements by artists' managers, promoters, or other industry professionals purporting to speak to how much artists like to play in an amphitheater (mostly because it's outdoors), Dkt. 799 ¶ 25a–c; (4) a promoter testifying that his inability to place artists in amphitheaters is an existential risk for his business (so strong is the artists' preference, the Court is invited to infer), Dkt. 696-5 at 225:24–226:12; and (5) an email from an artist stating that, "[a]s an artist, I know I'd want to play this amphitheater for 8 percent less [than an arena] walkout all day long. Nothing against the arena it's just a totally different show," Dkt. 744-19 at 2.

The record has many more examples of similar statements. This evidence, taken as true and viewed in the light most favorable to the government, supports the proposition that there's a group of artists with highly inelastic demand for amphitheaters—so much so, that they'll pay higher prices. That demand can be understood as based both on the peculiar characteristics that distinguish amphitheaters from indoor venues, and also on the potential costs of switching production between

amphitheaters and arenas in the middle of a tour. The relevant question is then whether this all permits the inference that enough artists have this preference such that there's a genuine dispute over whether it's a relevant antitrust market. It does. The government's evidence would permit a jury to find that these artists' preferences (informed by the peculiar characteristics of amphitheaters and any switching costs) are sufficiently representative of a large enough group to define a market here.

To be clear, the Court expects Live Nation to vigorously contest this market definition at trial. For example, it has presented some quantitative evidence based on what happened after a single MCAmp closed that purports to suggest that few artists have such inelastic demand for MCAmps. Dkt. 717-3 ¶ 102. Whether that evidence is representative of all artists and how it should be weighed against the testimony elicited and the documents produced at trial is ultimately a question for the jury to decide.

### 2. The HMT

Hill's HMT for this market closely resembles his analysis for the promotion-services market at MCVs discussed above, and Live Nation moves to exclude it on the same basis. This market, unlike the promotion-services market, is directly between the artists and the venues, cutting down on some of the problems that the Court identified with the prior analysis. But here, just like in the promotion-services market, Dr. Hill has calculated his diversion ratio using the same "order of shows" analysis and then his show-weighted and monthly-persistence alternatives. These analyses look to either where an artist performs next after performing at a large amphitheater or to artists' decisions across locations in the aggregate. The Court need not recap why it found the "order of shows" methodology unconvincing, or why the corrected show weighted average methodology isn't any better—those are captured above. For the same reasons, the Court excludes Hill's HMT opinion.

\* \* \* \* \*

The government has made a sufficient showing under *Brown Shoe* to carry its burden at this stage in the litigation. Whether enough artists are loyalists to MCAmps to constitute a relevant antitrust market is a factual question for the jury to resolve, and the evidence produced by the government would permit a jury to decide the question in its favor. Though Hill's HMT isn't admissible under *Daubert*, he may still testify as to background information and statistics about this market, as those statistics are relevant to understanding artists' cross-elasticities of demand.

If the government can prove its proposed amphitheater market at trial, then it can also establish Live Nation's monopoly power: depending on how you count, there is evidence that Live Nation has around an 80% market share in that proposed market. Dkt. 717-1 ¶¶ 302–03.

### III.  The venue-facing markets

The next three markets that the government proposes all involve the same injured party: the MCVs themselves. The first of these markets is between promoters and MCVs, in which the government alleges that Live Nation has monopoly or market power in providing concert-booking

services to MCVs. The second and third markets are primary ticketing markets—there, the theory is that Ticketmaster (owned by Live Nation) has monopoly or market power in a market for primary ticketing services to MCVs. Each of these markets is described by reference to a type of targeted customer: the MCV.

### A. "Targeted customer" markets and MCVs

#### 1. Targeted customer markets

Before proceeding to analyze each alleged market, some discussion of targeted customer markets is needed. A point of ambiguity in antitrust law, they are a flashpoint of contention between the parties. Targeted customer markets build on a basic intuition embedded in the *Brown Shoe* factors: that "distinct customers" can be important to properly defining a market. *Brown Shoe*, 370 U.S. at 325. In a targeted customer market, the product is the same, but the market is drawn more narrowly around the providers who sell to a subset of the customers.

This idea is most intuitive in the context of a geographic market. Somebody who lives in New York is unlikely to go to San Francisco to hire a plumber. As a result, the prices of plumbers in New York are unlikely to be disciplined by a far-away competitor. That's a typical exercise of defining a market as a narrower group of customers (New Yorkers) for a product that has a broader customer base (plumbing services). This logic applies also in defining product markets, not just geographic markets. Areeda and Hovenkamp helpfully explain why that's the case. Consider a pharmaceutical company that sells drugs both to managed care organizations (which will purchase only one of a type of drug and not purchase substitutes) and also to pharmacies (which must keep *all* options on hand to fill prescriptions). Areeda & Hovenkamp ¶ 533d (drawing these facts from *Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999)). In that setup, it may be possible for the seller to charge a different price to each type of customer. And so the presence of distinct groups of customers with differing needs and constraints may justify drawing separate markets for each of them: there, "sales of [the] branded pharmaceutical generally, and sales to pharmacies." *Id.*

To understand how this approach differs from the typical exercise in market definition, consider how it would interact with the HMT. It suggests that the HMT analysis sometimes misses the point—it assumes that *all* customers of a product would face the same increase in price and that some would leave the market and others would either keep buying or be recaptured. But if a hypothetical monopolist could implement the price increase *only* for the customers who are the least likely to switch, that foundational assumption breaks down. The relevant antitrust market, by that logic, would be smaller as to those "core" customers, yielding greater market share for the defendant company and a greater presumption of market power.

The Merger Guidelines endorse the possibility of a targeted customer product market. But they note that two conditions "typically must be met" for it to exist. Merger Guidelines § 4.3.D.1. First, "the suppliers engaging in targeting must be able to set different terms for targeted customers," *id.*, also known as "price discrimination." That entails the ability to identify these customers and

change prices for them only. *Id.* And second, "targeted customers must not be likely to defeat a targeted worsening of terms by arbitrage (e.g., by purchasing indirectly from or through other customers)." *Id.*; *see also* Jerry A. Hausman, Gregory K. Leonard & Christopher A. Vellturo, *Market Definition Under Price Discrimination*, 64 Antitrust L.J. 367, 370–76 (1996). To make that concrete: If plumbers charge different prices in New York and in San Francisco, there's no way for a New Yorker to buy the cheaper West Coast plumbing services from some San Franciscan who bought them first.

The DOJ and FTC have argued in favor of this theory in a series of merger challenges over the last couple of decades. *See, e.g.*, *FTC v. Sysco*, 113 F. Supp. 3d 1, 38–40 (D.D.C. 2015) (noting that this approach is "not free from controversy," and resolving the case on other grounds); *FTC v. Staples*, 190 F. Supp. 3d 100, 126 (D.D.C. 2016) ("*Staples II*") (defining a targeted customer market); *Wilhelmsen*, 341 F. Supp. 3d at 56 (same); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 25 (D.D.C. 2022) (same for sellers in a monopsony case). The D.C. Circuit has addressed the theory only once. The result was a splintered set of opinions, with only one judge's vote endorsing the government's articulation of a targeted customer market. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008) (opinion of Brown, J.). Though these cases aren't uniform in their application of the targeted customer theory, all but one of them articulated the requirements the same way: both the possibility of charging different prices and the inability to defeat price discrimination by arbitrage.[2]

That analysis turned on *possibility* because of the practical reality of merger review. In that context, a court confronts a potential monopoly before it's formed and so necessarily must speculate about what might happen. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) ("By focusing on the future, section 7 gives a court the uncertain task of assessing probabilities."). But recently the government has brought monopolization cases under the Sherman Act, arguing not that there will be some future monopoly of a targeted customer market, but that there exists one here today. To the Court's knowledge, this is only the second one of those cases.

The first was *FTC v. Meta Platforms, Inc.*, -- F. Supp. 3d --, 2025 WL 3458822 (D.D.C. Dec. 2, 2025). There, the FTC argued that some users of Meta "want[] to see content from their friends, [and] cannot get it elsewhere." *Id.* at *34. By way of *Brown Shoe* and the HMT, the court initially rejected the FTC's primary argument that personal social networking apps are a different product market from alternatives like TikTok and YouTube. *See id.* at *17–34. The targeted customer theory was the backup. Under that theory, the government argued that (1) "the vast majority of users still come to Facebook and Instagram" for interaction with friends and family, and that (2) "this demand is so 'resilient' that Meta cannot displace friend content." Plaintiff's Post-Trial Reply and Opposition Memorandum at 13, *FTC v. Meta Platforms, Inc.*, 2025 WL 2886554, No. 20-cv-3590,

---

[2] The exception is Judge Brown's *Whole Foods* opinion*,* which did not consider whether the defendant had the ability to set different prices but otherwise relied on the Merger Guidelines. The Merger Guidelines don't foreclose the possibility of defining a targeted customer market some other way, but they don't describe how that might be done. Merger Guidelines § 4.3.D.1.

17

Dkt. 681 (D.D.C. Aug. 27, 2025). These "core" users could presumably be held hostage and either charged higher prices or be offered worse terms. The wrinkle, the court pointed out, is that the evidence didn't bear that out. Instead, "quality mostly does not vary across users," the part that *did* vary wasn't very important to users, and the FTC's expert "admitted that he could not measure whether users faced significant price differences." *Meta,* 2025 WL 3458822, at *35.

That sets up the clash between the government and Live Nation. Live Nation argues that *Meta* stands for the proposition that a mere possibility of price discrimination isn't enough in an actual monopolization case. Instead, the plaintiff must pony up evidence of *actual* differing prices or terms for the targeted customers. The rationale for that requirement is that on a monopolization claim the court doesn't confront an alleged potential monopoly, but an alleged real one. If the market definition that supports the monopolization claim rests on the premise of price discrimination, then that price discrimination should be observable in the world. Though it's often difficult to observe monopoly prices because prices have already been raised for the whole market (making comparison difficult), that shouldn't be the case when the theory is that some customers are, in fact, charged more than others (or receive worse terms). If that evidence doesn't exist, says Live Nation, you don't pass Go, don't collect $200, and don't proceed to the *Brown Shoe* factors or the HMT.

The government's view is harder to pin down. What's certain is that it argues that *Meta* stands for no such test. What's less certain is which test the government endorses instead. Initially it relied on the two Merger Guidelines requirements: "that targeted customers (1) may face different terms; and (2) are unlikely to defeat a worsening of terms by arbitrage." Dkt. 755 at 17 (relying on *Wilhelmsen*, 341 F. Supp. 3d at 51–57 and the Merger Guidelines). Because, it said, the evidence showed that "MCVs are readily identifiable … and can be offered different terms," and because they can't "engage in arbitrage," the government argued that "summary judgment is inappropriate." *Id.* Now, in supplemental briefing, its stance appears to have shifted. It argues that only the *Brown Shoe* factors and the HMT are relevant and it eschews any mention of the Guidelines' conditions. Dkt. 977 at 1.

As the Court sees it, there are two questions at the heart of this debate. First, in an actual monopolization case must a plaintiff produce evidence of actual differing prices (or quality) to define a targeted customer market? Second, if the government has invoked a targeted customer market, then are *Brown Shoe* and the HMT irrelevant? The Court answers no to both.

Start with what's required to define a targeted customer market outside of the merger context. Of course, a Sherman Act case sidesteps "the uncertain task of assessing probabilities" that's required when a court must speculate about what might happen after a merger. *Baker Hughes*, 908 F.2d at 991. As a result, evidence of differing prices may well be available. But it would be unusual and inconsistent with caselaw to require it for two reasons.

The first reason is that courts frequently engage in a type of targeted customer analysis without requiring evidence of actual price differences. That exercise is commonplace in defining geographic markets, in which the product is the same but the relevant group of customers may differ

by virtue of their location. *See, e.g., United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 357–58 (1963) (local market of customers justified because "they find it impractical to conduct their banking business at a distance"); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 571 (1967) (regional markets of customers justified "[b]ecause it is not feasible to ship the product more than 300 miles from its point of manufacture"). In defining a geographic market, courts consider *why* certain customers may be segmented from others but have not required an explicit showing of differing prices. The Court is cognizant that geography may be one of the strongest, clearest reasons to identify markets by their customers. But that doesn't mean that it's the only permissible reason or that additional evidentiary standards kick in when other reasons are invoked.

In fact, across the Supreme Court's and the Second Circuit's precedents, the Court was able to identify only a single case that might be read to apply such a requirement. In *United States v. Eastman Kodak*, 63 F.3d 95 (2d Cir. 1995), the Second Circuit rejected a domestic-only customer market, faulting the government for failing "to produce probative evidence of systematic price discrimination." *Id.* at 106–07. But, critically, the government had affirmatively argued that its proposed geographic market was based on evidence of actual price discrimination. *Id.* at 102. Against the backdrop of cases in which geographic markets have been defined without that kind of evidence, *Eastman Kodak* can't be read as anything broader than a rejection of the government's price-discrimination-based argument as presented. *See FTC v. Hackensack Meridian Health*, 30 F.4th 160, 168 (3d Cir. 2022) (reaching the same conclusion).

The second reason is that requiring evidence of price differences would create the unusual result of conditioning the existence of a market on a monopolist's *use* of its monopoly power. But "the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946); *accord* Areeda & Hovenkamp ¶ 501 (market power "is large when a firm *can* profit by raising prices substantially without losing too many sales" (emphasis added)). This requirement would go well beyond established precedent.

And adding this additional requirement would create perverse results. Adding an "actual-prices" evidentiary requirement would unduly foreclose an available path for plaintiffs later in the Sherman Act analysis. Once a market is defined, the next stage in a court's inquiry is whether the defendant exercises power in that market. That may be shown either by direct or indirect evidence. The direct evidence is exactly what Live Nation argues must be produced here at the market definition stage: "evidence of control over prices." *Geneva Pharms.*, 386 F.3d at 500. If the government must produce this to even *define* a targeted customer market, then in practice a plaintiff could never instead rely only on indirect evidence of market power in a targeted customer market case. That plaintiff would have to produce the same evidence that would be required under a direct-evidence approach, just earlier at the stage of market definition. The Court declines to create that new de facto requirement out of whole cloth.

So what does that mean for this case? At this point it's helpful to take a step back and consider the point of this entire exercise. A relevant antitrust market is just the "the arena within which

significant substitution in consumption or production occurs." Areeda & Hovenkamp ¶ 530a. While there are "established legal frameworks" for assessing that question, *Regeneron*, 96 F.4th at 340, market definition depends on "the actual dynamics of the market rather than rote application of any formula." *Geneva Pharms.*, 386 F.3d at 496. The *Brown Shoe* factors can help guide that inquiry by focusing it on salient facts that support a market. Similarly, the HMT is a helpful tool that takes into account real-world data, though it may often be imperfect. The question is whether these traditional legal tools bear out the government's proposed targeted customer markets.

### 2. What might make MCVs different

Before proceeding, the Court takes stock of what might make MCVs different from other types of venues.

*First*, the government alleges that MCVs attract different artists than do other kinds of venues. Stadiums, they argue, typically attract absolute superstars; smaller venues attract the lower-billing acts. MCVs are alleged to be the "goldilocks" venue in between, played by artists who've outgrown a theater but can't fill a stadium. Dkt. 717-1 ¶¶ 136, 143, 149. As a result, the costs of putting on a show may differ. Stadium events (not in the MCV market) cost much more to produce than those at MCVs; and similarly, smaller events (also not in the market) cost much less. *Id.* ¶ 149.

*Second*, the government alleges that MCVs are high-volume customers. It proposes a cutoff of 10 concerts in at least one year from 2017 to 2024, which Hill opines is justified by "industry participants segmenting venues based on the number of shows a venue hosts in a year."[3] *Id.* ¶ 144. The record supports that generalization, and as with the next point, it suggests that MCVs are more dependent on concerts—the focus of this case—than are other types of venues.

*Third*, related to the last point, the government points out that MCVs make up around 40% of all primary ticketing concert revenue, *id.* ¶ 148, and it points to deposition testimony suggesting that stadiums aren't designed for concerts, *id.* ¶ 153. Additionally, some industry insiders testified that arenas and amphitheaters rely heavily on concerts for revenue, especially compared with stadiums. Dkts. 696-21 at 37:22–39:7; 696-18 at 45:3–8; 695-7 at 182:1–184:1. To put some numbers on that, one internal Ticketmaster document estimated that concerts make up 59% of tickets sold at NBA and NHL arenas, while they make up 43% of all tickets sold at NFL stadiums at 10% at MLB stadiums. Dkt. 758-12 at 7.

Much of this is summarized in the tables below, with some of the relevant comparisons highlighted. The first table shows summary statistics for the two types of venues that make up MCVs, and then for the venues that are left out. The second table compares MCVs to the venues that were left out because of either capacity or volume of concerts.

---

[3] Hill's reliance on qualitative evidence is the subject of a *Daubert* motion, but for these purposes, the Court looks at the underlying evidence itself, rather than any expert gloss that Hill puts on it.

The point conveyed by the first table is that the venues inside the MCV definition have similar numbers of average tickets sold, all-in price, Spotify monthly listeners, and percent of events by Billboard artists. By contrast, both stadiums and other non-MCVs (the alternative venues that could be in the market) have very different numbers—stadiums typically much higher ones and other non-MCVs much lower ones. The point conveyed by the second table is that the venues that were excluded either because of a lower capacity or because they host fewer concerts are also very different from MCVs along these same metrics. Here, the numbers are all much lower for the excluded venues.

| Venue type | Average tickets sold | Average face value per ticket | Average all-in price per event | Average Spotify monthly listeners for performers | Percent of events by Billboard artists |
|---|---|---|---|---|---|
| Major concert venues | 9,067 | $87 | $1,093,629 | 11,474,334 | 45% |
| Major concert amphitheaters | 9,621 | $63 | $869,836 | 9,470,565 | 45% |
| Major concert arenas | 8,775 | $100 | $1,211,944 | 12,579,577 | 46% |
| Non-major concert venues | 1,787 | $46 | $189,396 | 3,719,926 | 9% |
| Stadiums | 34,813 | $142 | $7,661,855 | 33,938,257 | 65% |
| Other non-major concert venues | 1,436 | $45 | $109,943 | 3,348,744 | 8% |
| All venues | 2,633 | $51 | $294,492 | 4,795,257 | 13% |

Dkt. 717-1 ¶ 149.

| Venue type | | Average tickets sold | Average face value per ticket | Average all-in price per event | Average Spotify monthly listeners | Percent of events by Billboard artists |
|---|---|---|---|---|---|---|
| Major Concert Venues (MCVs) | | 9,067 | $87 | $1,093,629 | 11,474,334 | 45% |
| Venues that would be MCVs but... | ...have capacity less than 8,000 | 3,210 | $59 | $260,848 | 5,280,864 | 21% |
| | ...fewer than 10 concerts in each year | 5,306 | $60 | $446,355 | 6,325,044 | 33% |

*Id.* ¶ 151.

With that in mind, the Court can turn to the three targeted customer MCV markets.

## B. The national market for MCVs between venues and promoters

The first of these targeted customer markets is between the MCVs and promoters for concert booking and promotion services. On the government's view, this is a targeted customer market because at a high level the product is uniform (concert-booking services), but MCVs are customers with highly specific needs.

### 1. Brown Shoe

The government uses the *Brown Shoe* factors to tell its story of MCVs as especially dependent on concerts and, by implication, on the promoters who work with them. Here, while the evidence doesn't always correspond to the government's characterization of it, there is enough evidence that

MCVs are distinct customers to get over the summary-judgment hurdle. The contested *Brown Shoe* factors are:

*Recognition of the market as a separate economic entity.* The government argues that Live Nation "tout[s] [its] share of the MCV booking market," Dkt. 755 at 18, but—like much of the rest of the evidence at issue in this case—the documents that it points to don't treat MCVs as a category. These documents instead show only that Live Nation sometimes discussed promotion services with respect to types of venues. Dkts. 762-35 at 15 (internal document analyzing "The Top 20 Arenas" and calculating Live Nation's market share of them); Dkt. 840-24 (internal analysis separately considering promotion at arenas and at amphitheaters). The relevance of other cited evidence to this factor is puzzling and entirely unexplained by the government. Dkts. 837-37 at 42 (promotional material describing Live Nation's "strong local, regional, and national touring programing"); 840-25 (a series of spreadsheets with the names of arenas and financial information). To be clear, this doesn't mean that the record is devoid of evidence of industry recognition of capacity, type of venue, or frequency of shows. As described earlier, there's evidence of each of those. The problem is that these factors aren't discussed in a unified way, such that there's industry recognition of the *market* that the government proposes or *commonalities* across the different types of venues. This factor doesn't support the MCV market definition.

*Distinct customers, prices, or sensitivity to price changes.* Part of the government's theory is that MCVs are distinct customers because they're exposed to a specific set of artists that are tightly linked to a certain set of promoters. As described earlier, there's evidence in the record suggesting that MCVs typically host a "goldilocks" sort of artist—not too popular, but just popular enough. And MCVs get a great deal of their revenue from concerts, so they're heavily dependent on the supply of concert artists. As relevant to the *Brown Shoe* factors, this theory of distinct customers might be borne out in price evidence or in evidence about a lack of sensitivity to price changes.

There isn't much evidence of prices actually being different. But as discussed, this isn't required, and there is evidence of the lack of sensitivity to price changes. First, there is evidence that moving to self-booking isn't a viable option. For instance, an industry executive testified that doing your own promotion as a venue is difficult and unlikely, Dkt. 695-7 at 102:13–23, 342:11–343:5; and an email chain involving that same executive stated something similar, Dkt. 754-4 at 2. That might differentiate MCVs from theaters, for example, which "self-promote a lot of their content." Dkt. 696-16 at 141:17–18. Next, there's evidence suggesting that MCVs rely more heavily on concerts for revenue, and that substituting to other types of programming (for instance, family shows like Disney on Ice) would be substantially less profitable. Dkts. 696-16 at 126:3–7, 129:24–130:24; 758-12 at 7. And there's evidence that this profit motive affects venues' negotiations in at least some cases. Dkt. 696-7 at 51:19–55:11 (venue executive testifying that they paid more to Live Nation because they were sensitive to concert revenue). This is all indirect but probative evidence. It gives support to the notion that at least some MCVs have highly inelastic demand for concert-booking services for the artists that they're targeting, and that there are reasons specific to MCVs that explain this.

*Specialized vendors*. Here, the government's argument is that there is a group of promoters with "unique access to MCV artists." Dkt. 755 at 19. In other words, the presence of these types of specialized vendors is indirect evidence of MCVs being a distinct, targeted customer. The government points to three pieces of evidence. The first is a statement from an arena executive that "if you look at the tickets sold year to year, [Live Nation is] 80% of the business." Dkt. 696-7 at 64:15–17. The second is a statement made by another arena executive that it wouldn't be able to promote the same number of shows without relying on Live Nation because "Live Nation is the, you know, dominant supplier of concerts in the United States." Dkt. 694-2 at 104:2–6. The Court notes also that—while the government has not argued it—the record supports another argument in favor of specialized vendors. Promoters must absorb some amount of financial risk, and MCVs often require the promoter to shoulder greater risk—for example, as the expected sales rise, so would the up-front payment to an artist. Dkt. 717-3 ¶ 36. Smaller promoters that work with smaller venues may not be able to shoulder those risks, as Live Nation's own expert opines, *id.* ¶ 37, suggesting some limits on the ability of a venue to switch to promoters who work with smaller acts and venues. (Of course, it isn't clear whether there's parallel logic that would explain why venues couldn't switch to promoters who work with bigger acts.)

Taken together, this qualitative analysis supports that there's a genuine dispute of material fact about whether this market is properly defined.

### 2. The HMT

The government directs the Court to Hill's expert report, which contains his HMT analysis for this market. Dkt. 755 at 19 (citing Dkt. 763 ¶ 154, which in turn cites Hill's analysis). Unlike Hill's HMT on the artist-facing market, Live Nation has not moved to exclude this analysis.

Here, because this is a venue-facing market rather than an artist-facing one, the calculated outside diversion ratio takes into account how Hill anticipates the venues will react in anticipation of a SSNIP in promotion services. To calculate the outside diversion ratio, Dr. Hill assumes that it would be the same as "the share for non-concert events," meaning that it's equal to the percentage of events held at MCVs that aren't concerts. Dkt. 717-1 ¶ 209. That number is 27%. *Id.* He then plugs that number into his HMT as the outside diversion ratio. What does all that mean? Hill uses the share of events at MCVs that aren't concerts (and therefore don't use concert-booking services) as the yardstick for who would exit the market for concert-booking services (by booking something else) if concert-booking services became more costly. Live Nation challenges this analysis by asking what it has to do with a market for concert-booking *services* because it's a measure of hosting a different *event* instead.

In his rebuttal report, Hill provides a sensible answer. He reasons that "[i]f a monopolist of all types of concert booking services at major concert venues imposed a small price increase on concert booking services, major concert venues could respond by booking other concerts or by booking other types of events." Dkt. 717-2 ¶ 202. The portion who book other types of events would be the ones that leave the market. *Id.* Live Nation's other arguments against the HMT come down

to disputed factual questions for a jury—for example, whether all sporting events should be included as an outside option, or only some selection subset. Those turn on the fact-bound nature of booking different events with different industry norms or constraints and are inappropriate to resolve at this stage.

* * * * *

There's a genuine dispute of material fact about whether there's a relevant antitrust market between promoters (concert-booking services) and MCVs. The government proposes that Live Nation's market share is somewhere between 55% (based on the number of events) or 63% (based on the number of tickets sold). Dkt. 717-1 ¶ 215. Live Nation doesn't contest these numbers, nor does it make any arguments about what level of market share is needed to support an inference of monopoly. So for summary judgment purposes, there's a triable question of fact on these issues.

### C. The national markets at MCVs between venues and ticketers

The next two targeted customer markets are between venues and primary ticketers. The first is a market for primary ticketing services to concerts at an MCV. The second is a market for primary ticketing services to *any* event at an MCV. The parties don't brief these two markets separately. At the hearing, the government initially represented that they rise and fall together. Hearing Tr. at 118:5–9 ("The Court: So the briefing does not address these separately. Do they rise and fall together?... Ms. Sweeney: They do, your honor."). But in a supplemental letter the government now maintains (without explanation) that "the venue-facing primary ticketing markets are separate and do not necessarily rise and fall together." Dkt. 977 at 5. Nonetheless, the government has not treated these markets separately in its briefing nor in the body of its expert report, Hearing Tr. at 118:10–14 ("That's in his Appendix F"), and so the Court analyzes them together for want of any other option.

In these markets, the government's theory is that MCVs are distinct for two reasons. The first is that MCVs are highly reliant on concerts for their revenue. That means Live Nation can threaten to withhold concert content from MCVs (through its promotion arm) unless they pick Ticketmaster as their primary ticketer. Second, the government argues that the ticketing needs of MCVs are simply different from those of other types of venues. The *Brown Shoe* factors and the HMT support that there's a genuine dispute of material fact about whether this is a relevant antitrust market.

#### 1. Brown Shoe

The government argues that three *Brown Shoe* factors support this market. The thrust of the argument is that MCVs have distinct ticketing needs, that this leads to specialized products, and that the industry recognizes this.

*Industry recognition.* The government argues that "Ticketmaster segments its business by venue type and recognizes that MCVs have similar needs from ticketers." Dkt. 755 at 18 (internal citations omitted). As support it relies on some evidence of a type that's by now familiar: internal documents analyzing types of venues separately or statements from Ticketmaster employees corroborating that Ticketmaster treats venue types separately. *See, e.g.*, Dkts. 750-9 at 4; 751-8 at

24

16:20–18:14 (describing different sales teams for different types of venues, notably splitting NBA/NHL arenas from another category with non-sports arenas and amphitheaters). For the reasons already explained, these don't support the market definition the government argues for. But there is evidence that "[t]he ticketing needs and priorities for a stadium … differ from what an NBA or NHL arena would need," justifying separate divisions for each, according to one Ticketmaster executive. Dkt. 751-7 at 14:19–22. And that's driven by, among other things, "capacity[,] [b]ecause the stadium is 60-, 70,000 tickets, versus a 20,000-seat arena." *Id.* at 15:3–5. And on the flip side, ticketing small venues is recognized to work very differently than for bigger ones. Dkts. 696-2 at 88:16–20, 89:1–2 (testimony that it's "a very different operation lift" to ticket at a larger venue "versus a black box club"); 748-20 at 203:24–204:3 (agreement that "there is complexity to execute ticket operations at scale"); 754-14 at 71:14–72:4 ("[I]t is my understanding that there is a difference in the technical requirements between selling general admission ticket at a single price versus multiple different prices, sections, seats, et cetera," as you'd expect at a larger venue versus a smaller one). That supports industry recognition of the market as an economic unit.

*Distinct prices and sensitivity to price.* The government argues that MCVs are potentially less sensitive to price because they're "unlikely to defeat a worsening of terms by self-ticketing." Dkt. 763 ¶ 148. There's testimony supporting that "[t]icketing systems are generally too expensive and too difficult for venues to build themselves." Dkt. 799 ¶ 14. That explains why one alternative may be off the table. The other potential alternatives would be using a ticketer that services theaters or one that services stadiums. That possibility is explored further below in the discussion of specialized vendors.

Next, the government argues that MCVs are less sensitive to price than other venues because there's a thumb on the scale: Live Nation's threats. MCVs are more reliant on concerts than stadiums, and so the impact is higher when Ticketmaster threatens to pull Live Nation concerts unless the venue signs with them (as is alleged). As discussed, the government has pointed to plenty of evidence that at least creates a genuine dispute of material fact about whether MCVs are more dependent on concerts than stadiums. Dkts. 696-21 at 37:22–39:1; 696-18 at 45:3–7; 695-7 at 182:1–184:1; 758-12 at 7. And as will be discussed further below in the context of the government's exclusive dealing theory, there's evidence in the record of threats, backing the story up further.

*Specialized vendors.* The government points to testimony that MCVs require specialized ticketing services. This testimony explains that arenas have "materially different" ticketing needs than do clubs or large theaters because the latter two are "general admission" (while arenas have specialized seating); plus, ticketing at arenas comes with other differences, like dealing with sports team tenants (which require an "entire suite of tools that manages season ticketholders") and dealing with lots of "bots" buying tickets. Dkt. 696-10 at 168:13–170:15; 696-6 at 70:23–71:11; 696-18 at 268:1–268:18. For that reason, the set of companies that provide ticketing services is different between smaller venues and arenas. Dkt. 744-7 at 85:9–16. Putting that together with the testimony cited above creates a genuine dispute of material fact about whether arenas have different ticketing

needs from clubs or large theaters. Then, some testimony supports the fact that stadiums have different ticketing needs from arenas. Dkt. 751-7 at 14:19–15:5.

Putting that together, the *Brown Shoe* factors are sufficiently disputed to support a picture of MCVs as unique economic actors situated between stadiums and large theaters. Unlike stadiums, MCVs are more exposed to concerts and so uniquely vulnerable to any threats of withholding content. And unlike theaters, MCVs can't turn to self-ticketing or smaller ticketers because they're unable to meet their needs.

### 2. HMT

For his HMT for this market, Hill defines the outside diversion ratio by looking at the portion of venues that *self-ticket*. The underlying assumption is that if there's a market that consists of *all* ticketers to MCVs, then the only alternative is to ticket the event yourself. Recall that in his HMT for the concert-booking services market, Hill assumed that the option outside the market was to move to a different type of event (and that self-promotion was *inside* the market). Here, the assumption is that the only option outside the market is self-ticketing and that the market is all ticketers. On that score, only 3% of MCVs self-ticket, according to Hill. Dkt. 717-1 ¶ 232. He then uses that number as his outside diversion ratio and concludes that the market passes the HMT.

While there's nothing intrinsically wrong with Hill's approach, the government doesn't do much to explain how it helps its proposed market definition or how it would account for other types of ticketers. However, in light of the evidence put forward by the government on the *Brown Shoe* factors, there is nevertheless a genuine dispute of material fact on market definition. And moving to Ticketmaster's market share, the government calculates it to be well over 80% based on tickets sold, a percentage that's held stable since 2017. Dkt. 717-1 ¶¶ 249, 250.

## IV.    The fan-facing market

Finally, we reach the end of the concert-production chain: the fans. The government proposes a national market in which Ticketmaster is the alleged monopolist and the fans are the harmed purchasers. As before, the government defines the market in terms of MCVs—here, concert tickets at MCVs. Live Nation challenges this market definition on both product and geographic grounds. On this evidentiary record, the government's proposed fan-facing market fails on both grounds.

### A.    Product market

The government has failed to create a genuine dispute of material fact about this market for two reasons.

*First*, the government doesn't put in dispute that it's a market at all. Fans buy tickets to a concert once the primary ticketer has already been decided. If you want to attend a Taylor Swift concert happening nearby and Ticketmaster has an exclusive ticketing contract with the venue, you may not have any option but to use Ticketmaster—and the same would be true if AXS had the contract instead. The competition, Live Nation argues, happens upstream in the market between

venues and ticketers. Not downstream between fans and ticketers. So even though fans might ultimately be injured by those upstream dynamics, they aren't participating directly in the market that's causing that injury.

The government responds in two ways. First, by invoking the *Brown Shoe* factors and pointing to statements that describe how Ticketmaster is sensitive to fans' user experience—their "pain points & unmet needs." Dkt. 761-32 at 2; *see also* Dkts. 751-9 at 2–3 (plans to improve the user experience); 757-26 at 4–27 (surveys of fans). These documents don't establish that there's a *market* here, but instead just that the user experience is important to Ticketmaster. That conclusion is equally consistent with the explanation that venues want to hire ticketers that fans enjoy using, and that Ticketmaster is attuned to that.

The government's second response is that "[f]ans' inability to choose among primary ticketers is not a natural feature of the market but rather *results from* Defendants' anticompetitive conduct." *Id.* While many primary ticketing contracts are exclusive, the government alleges that not all are. Under an "open-distribution" arrangement, it says, multiple ticketers may be authorized to sell tickets for an event. Dkts. 694-9 at 31:19–22; 838-5 at 7. If true, that would support the existence of a market: When choosing to attend a concert, a fan could choose whether to buy her ticket from Ticketmaster or from some other company, and the two would compete for the fan's business. The government relies on some indirect evidence supporting the inference that Ticketmaster only reluctantly allows for open distribution, and—if Ticketmaster really exercises all the market power that the government says that it does—that would explain why consumer choice isn't meaningful. Dkt. 746-18 at 2 ("TM obviously is much less flexible on open distribution strategies."). Simply put, the existence of this type of open-distribution arrangement could mean that there's at least a genuine dispute of material fact about whether the current market structure is an artifact of monopolization and so can't be used as evidence against finding that there's a market at all.

But this argument mischaracterizes open-distribution arrangements. The evidence in the record suggests that an open-distribution arrangement may refer to one of two practices, neither of which supports the government's characterization. The first is when the right to ticket a *single* concert depends on something else, like who the promoter is. Dkt. 695-11 at 34:20–35:19 ("[I]n a Ticketmaster building when AEG Presents would promote a show, AEG Presents would have the ability to utilize AXS, and conversely when Live Nation would come into a building ticketed by AXS, they would have the option to have a Live Nation-promoted show ticketed on Ticketmaster."). The second is a complex arrangement between ticketers and venues that was designed to get around the problem of venues circumventing exclusivity arrangements by "selling large groups of tickets—large blocks of tickets to ticket brokers, … [who would] resell those tickets on sites like StubHub." Dkt. 695-7 at 270:6–10. Under this arrangement, the venue and Ticketmaster would use "software tools" "that plugged into Ticketmaster's enterprise system that allowed [the venue] to simultaneously sell the same ticket on multiple websites." *Id.* at 270:13–15, 271:24–272:4. However this worked, it appears to be far from the type of open-distribution model pondered by the government, in which multiple primary ticket sellers would distribute tickets to the same event.

Instead, it's an arrangement that involves a *single* primary ticketer (Ticketmaster) and dictates how some portion of the tickets will then be distributed.

To that effect, the record is filled with testimony that having multiple primary ticket sellers for one event would be unworkable. Dkts. 694-5 at 50:13–52:6 ("Q: Has [this company] ever considered using more than one primary ticketer for its venues. A: No. It causes confusion in the marketplace…. [I]t serves no purpose whatsoever operationally. It's a nightmare."); 696-23 at 49:24–50:6 ("[I]t would be almost impossible to operate multiple ticketing platforms."); 695-31 at 52:20–21 (testifying that "having multiple primary tickers for a single … event" "could be almost like a near impossibility"); 696-6 at 261:17–262:1 ("Q: Okay. How many primary ticketing companies do you want selling tickets at Merriweather? … A: You can only have one at a time."). Though the government has pointed the Court to evidence that the phrase "open-distribution" is sometimes used, it has failed to point to evidence that the phrase is used in the way that it proposes. And against that there's a slew of testimony from industry executives that this type of arrangement is unheard of for practical reasons. This, by itself, is likely sufficient to preclude holding that this market is well-defined. But for the sake of completeness, the Court continues to consider the other arguments.

*Second*, as Live Nation points out, there's no reason here to limit the market to MCVs. Fans typically buy tickets for concerts of artists that they want to see instead of venues that they want to attend. So if there were a market here, one would think it would be the market for selling concert tickets to fans. The government's theory is that MCVs are the venues *with* the artists that they want to see—a theme that runs through many of their proposed markets. If MCVs have a lock on a certain type of artist, then that would explain why "show at an MCV" might be a relevant concept to a customer. Of course, that depends on whether the government has established that relationship. To that effect, it argues that (1) primary ticketing at MCVs has "peculiar characteristics" because of these venues' different needs from smaller venues as well as the "distinct artists," Dkt. 763 ¶ 181; (2) tickets to concerts at MCVs are priced differently from those "at smaller and larger venues;" *Id.* ¶ 182; and (3) "[f]an demand for primary concert tickets at MCVs is relatively insensitive to changes in price." *Id.* ¶ 184. The Court takes those one-by-one.

The evidence for the first point largely overlaps with that offered for the market between venues and primary ticketers—the Court found it convincing there to establish that ticketing needs vary by venue size. But in *that* market, the consumers were the *venues* themselves; here, the purported consumers are the *fans*. While the ticketing needs of venues might vary based on their size and dependency on concerts, fans aren't tied to either of those things. They see the artists they want to see, wherever they might be playing, whether it's a stadium, an arena, a large or small theater, or a church. Of course, the Court has already reviewed evidence that the artists who play at MCVs are on average less popular than those that play at stadiums and more popular than those that play at smaller venues like clubs. *See supra* Part III.A.2. But even if that's true, it doesn't support the additional necessary inference that there are fans who think of artists in this way—grouping them by popularity and conceiving of them as their list of plausible concert options.

Next, the evidence that tickets for shows at MCVs are priced differently from shows at other venues is probative and supports the proposition that customers pay distinct prices for these events. Dkt. 717-1 ¶ 149. But this doesn't move the needle because the government doesn't provide evidence that customers shop for shows in a category based primarily on price, as opposed to wanting to see their favorite artists. Finally, there's evidence that some fans at concerts are less demand-inelastic than others. For example, internal analysis suggests that customers have somewhat inelastic demand for tickets at arenas and amphitheaters within certain price ranges. Dkt. 748-5 at 10–11. But this evidence isn't focused on the type of venue, but rather, the type of tickets and customers. For example, concertgoers may have more inelastic demand than sportsgoers, Dkt. 754-20 at 51; and premium ticket buyers may have more inelastic demand than other buyers. Dkts. 835-23 at 3 (commenting on "the relatively inelastic demand for the best tickets"); 758-3 at 7 ("P1 buyers appear more inelastic."); Dkt. 748-5 at 10–11 (noting that "P1" customers have inelastic demand). In other words, the government doesn't point to evidence that *MCV* customers have inelastic demand—just other categories, like *premium* buyers.

Putting that together, the *Brown Shoe* factors don't support restricting this market to MCVs. The government fails to raise a genuine dispute of material fact that it's a "market" at all and, even if it is, that it should be restricted to MCVs. The Court notes that Live Nation has separately argued that the market definition is incomplete because it improperly excludes the secondary market for tickets. Because the Court finds that the reasons above are independently sufficient to justify summary judgment, it doesn't address that argument. Similarly, because these reasons are independently sufficient, the Court doesn't address Hill's "qualitative" HMT analysis, which rests on the presumption that these interactions can be deemed a market at all.

### B. Geographic market

Another problem with this proposed market is its national scope. Live Nation points out that fans don't plausibly engage in a *national* market for shows at MCVs. The government counters that "many fans travel far—sometimes hundreds of miles—for concerts at MCVs." Dkt. 755 at 25. The Second Circuit has upheld a district court's holding that concert tickets aren't sold in a national market, stressing the importance of "elasticity in the market for concert tickets across geographic locations." *Heerwagen v. Clear Channel Comms.*, 435 F.3d 219, 229 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–03 (2d Cir. 2008). Here, the government fails to show anything like cross-elasticity of demand for concerts in different locations. Their evidence is a deposition saying that fans sometimes drive "a couple hundred miles," and a survey in which about a third of fans said that they had traveled over 250 miles in the last year at least once to see some type of concert (that would include festivals and concerts at stadiums). Dkts. 757-39 at 64:25–65:9; 841-6 at 8, 16. First off, that isn't national. Second, that some people sometimes travel for a concert (at any kind of venue) offers no ability for the Court or a jury to analyze the cross-elasticity of demand at a national level for shows at MCVs.

29

Of course, the presence of local operations of a national enterprise doesn't mean that no national market can exist. In *United States v. Grinnell Corp.*, the Supreme Court held that a national geographic market was proper when the company coordinated everything nationally, but each of its vendors sold only to customers in a 25-mile radius. 384 U.S. at 575–76. To that point, the government argues that Live Nation's contracts, logistics, and tours are all national, just like in *Grinnell.* But the market presented there was materially different from this one. In *Grinnell*, the question was whether the market for a single product was national even though the customers purchased them locally; here, each concert is *distinct*, and the question is whether fans travel *broadly* to attend those distinct concerts. To that point, the *Grinnell* customers were themselves "multistate businesses" who used "nationwide contracts." *Id.* at 475. The government hasn't pointed to a shred of evidence suggesting that fans similarly operate by following an artist's entire MCV tour. A product market cannot be national only by virtue of the selling company operating nationally if customers for the product don't typically shop outside of their locales. *See* Areeda & Hovenkamp ¶ 530a1 ("Geographic market inquiries center on the area where sellers compete for a group of buyers.").

And even if all these hurdles could be overcome, why is this supposed national market particular to concerts at MCVs? If anything, one would assume that the concerts most likely to draw fans to faraway shows would be the biggest acts—Taylor Swift or Beyoncé—who often perform in stadiums, outside of the government's proposed market.

There's no genuine dispute of material fact as to the government's proposed nationwide fan-facing MCV-only ticketing market.

## V.    Section 2: Anticompetitive conduct

Being a monopolist is not sufficient by itself to violate Section 2 of the Sherman Act. Plaintiffs must also show "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71. Concretely, that means showing that Live Nation's actions have an "anticompetitive effect." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "That is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *Id.*

That showing may be made "directly or indirectly." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (cleaned up). "[O]nce a plaintiff establishes that a monopolist's conduct is anticompetitive or exclusionary, the monopolist may proffer 'nonpretextual' procompetitive justifications for its conduct." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015) (quoting *Microsoft*, 253 F.3d at 58–59).

### A.  The artist-facing amphitheater market

In the artist-facing market, the government argues for a tying theory of anticompetitive conduct. The theory is that Live Nation lets artists use its amphitheaters (the tying product) only if they also use its promotion services (the tied product). Live Nation argues that summary judgment is warranted on this tying theory for three reasons. All fail.

*First*, Live Nation is wrong that the customers in this market are indisputably the promoters, as opposed to artists. Live Nation has no duty to deal with its competitors as a general matter. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("As a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (cleaned up)). That isn't disputed in this case. The question, as the parties frame it, is whether artists are functionally the customers of venues or whether they're just customers of promotion services. If artists do nothing but purchase promotion services without regard to which venue they want to be in, then *Trinko* is highly relevant. But if artists are the real customers, who purchase two *separate* products (promotion services and placement at a venue), then tying is a viable theory. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 473 (7th Cir. 2020). Live Nation argues that *Viamedia* turned entirely on the application of the exception laid out in *Aspen Skiing Co. v. Aspen Highland Skiing Corp.*, 472 U.S. 585 (1985), to the general rule that a party has no obligation to deal with a competitor. In that case, a refusal-to-deal claim was permitted where a prior course of dealing was voluntarily terminated. *Id.* at 600–05. But the Seventh Circuit was clear in *Viamedia* that its reasoning went further than that: "a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Viamedia*, 951 F.3d at 472. And this point is sensible. *Trinko* contemplated only a single market, with a horizontal refusal to deal with competitors. 472 U.S. at 404–11. Its holding can't be read to extend as far as a claim that products in two markets are tied together.

The government and Live Nation have different models of the artist-promoter transaction, and there's a genuine dispute of material fact about who's right. The government describes the relationship between an artist and promoter as a principal-agent relationship, in which the promoter books a venue on behalf of the artist. Live Nation counters that promoters have their "own, independent commercial objectives." Dkt. 689 at 34. But divergent objectives are true of all principal-agent relationships—hence, the ubiquitous "principal-agent problem." The specifics of this relationship are more hotly contested and present a genuine dispute of material fact. For its part, Live Nation points to some discrete characteristics of these arrangements that suggest artists are single-shot customers who sell the rights to their performances to a promotion service. For example, some promoters have preexisting contracts with venues that promise to "use commercially reasonable efforts" to meet certain quotas for booking shows at the venue, potentially dampening artist choice. *See, e.g.,* Dkt. 693-20 at 2–3. Concretely speaking, that might mean that if the promoter must book ten concerts at a venue, it will be incentivized to steer an artist toward that venue. But it's undisputed that artists are the "ultimate decisionmakers for their shows and tours," complicating that story. Dkt. 799 ¶ 246. Those decisions may be informed by preferences about the type of venue

31

(as discussed earlier with respect to amphitheaters), or about cost. *Id.* ¶ 247. The jury could reasonably conclude that artists are customers of venues.

*Second*, the issue of coercion doesn't warrant summary judgment. Live Nation argues that the government can't take its tying claim to trial without some evidence of actual coercion above and beyond its policy of refusing access to other promoters. Dkt. 689 at 36. Of course, one element of a tying claim is "actual coercion," while another element is whether the sale of the tying product is "conditioned on" the sale of the tied product. *See Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016). But these shouldn't be understood to exist independently from one another. The Second Circuit has been careful to note that "these elements overlap." *Id*. In particular, "the separate product and market power requirements are usually essential to the coercion element," which is "designed to weed out the many cases where the bundling of separate products is due to commercial demand." *Id.* at 141–42 (internal quotation marks omitted). In other words, the relevant inquiry is whether the bundling is simply a function of what consumers want, or whether it's imposed on them. *See* Areeda & Hovenkamp ¶ 1702 ("[T]wo products are tied together or customers are coerced[] [when] [t]he customer takes the second ('tied') product from the defendant, not because he prefers it but only because he must take it in order to obtain a desired ('tying') product."). To that point, the government points to cases that say that "[a]n unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion." *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *see also Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary."). Live Nation doesn't respond to these cases.

Even if that weren't the case, the government has pointed to more concrete evidence that the tie is imposed on artists. That includes a situation in which an artist wanted to play at a Live Nation amphitheater with a different promoter but was rebuffed because the amphitheater was "off limits to" that promoter and Live Nation had "paid a premium for the [venue] to keep [the promoter] from having access within our season." Dkt. 752-19 at 2. Then, the government points to financial records that indicate that this same artist eventually ended up playing at the very same amphitheater he wanted—but with Live Nation as the promoter. Dkt. 752-18. Next, a promoter testified that he frequently was "out of the running" to promote artists because he couldn't "deliver amphitheaters," suggesting that artists faced limited choice because of the tie. Dkt. 696-5 at 73:3–5. Artists would ask him: "What about the amphitheaters?" when initially negotiating, and he'd have to reply that he "can't book" those. *Id.* at 70:24–71:2. And an agent for an artist testified that the artist chose Live Nation as their promoter "[b]ased on wanting to be outdoors for the majority of the tour," Dkt. 695-28 at 82:14–21. Taking all of that together with Live Nation's alleged market power and "unremitting" policy, a reasonable jury could certainly find that artists were coerced into going with Live Nation as their promoter to get into its amphitheaters.

*Third*, summary judgment isn't warranted based on anticompetitive effects. Of course, one element of a tying claim is that there are "anticompetitive effects in the tied market." *Kaufman*, 836 F.3d at 141. But the Supreme Court has recognized that true illegal tying is inherently linked

32

with anticompetitive effects. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–13 (1984) ("By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." (internal quotations omitted)). Plus, the government points to specific examples of diminished quality or output, such as a high percentage of "dark days" with no shows at Live Nation amphitheaters. Dkt. 840-37 at 10. A jury could find that was caused by Live Nation's tying.

The government's Section 2 claim based on its tying allegations proceeds to trial.

### B. The venue-facing booking services market

The government's theory of harm is thinnest in the targeted customer market between promoters and venues. In this market, Live Nation offers concert-booking services to MCVs, who are targeted customers. It offers two possibilities, but each is underbaked.

*First*, the government's merger theory is unsupported. It suggests—without any supporting caselaw—that Live Nation acquisitions of other promoters count as anticompetitive conduct by itself. Dkt. 755 at 35. But a Section 2 claim requires not mere growth by acquisition, but the willful maintenance or acquisition of monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 571. Though the Supreme Court has previously analyzed whether acquisitions can be relevant to a theory of *attempted monopolization* under Section 2 of the Sherman Act, *see, e.g.*, *United States v. Columbia Steel*, 334 U.S. 495, 532 (1948), the government hasn't provided any authority (nor can the Court identify one) that extends this analysis to the existence of anticompetitive effects. Perhaps recognizing this issue, the government offers a single theory of harm tied to these acquisitions: that "venues often pay higher rebates to LN when LN or its affiliates deliver more shows," so "the more promoter-affiliates LN acquires, the more venues pay LN." Dkt. 755 at 36. But this is just a description of an incentive contract—it's wholly unclear what the harm here is supposed to be.

*Second*, the government argues that Live Nation's ancillary fees increased from 2017 to 2024. Dkt. 755 at 35. But without more, this tells the Court nothing about whether Live Nation's prices were *above the competitive level*. *See Ohio v. Am. Exp. Co.*, 585 U.S. at 547–48 (noting plaintiffs' failure to "offer any evidence that the price of credit-card transactions was higher than the price one would expect to find in a competitive market"). It's a mere observation that fees increased over a seven-year period.

Without a triable issue of fact on anticompetitive effects in the venue-facing booking services market, the government's Section 2 claim concerning this market must be dismissed. With that, the Court moves to the primary ticketing market, where the government's theories are better developed.

## C. The venue-facing primary ticketing market

### 1. The competitive landscape and new entrants in the venue-facing primary ticketing market

The government offers three theories of harm in this market: foreclosure, a theory of raising rivals' costs, and a theory of high barriers to entry. At bottom, however, these all rely on the same basic allegation: that Live Nation has locked up a huge portion of the supply of venues, preventing new entrants from growing into bona fide challengers. Before addressing the government's reasons for this state of affairs, the Court takes stock of the competitive landscape in this market. Is it dynamic, full of new entrants? Have new players been able to get a toehold and grow that into meaningful scale?

Start with Live Nation's view of the market. On its telling, this is a fiercely competitive market in which primary ticketers compete vigorously for business from venues. It points to the entrance of two primary ticketers during the period alleged in the complaint: AXS and SeatGeek. Dkt. 689 at 27. And it argues that there are new entrants who have been successful in the MCV market as well as with other non-MCV venues like stadiums.

But a look at the raw numbers suggests that Live Nation's argument is vastly overstated: Over the last 13 years, AXS and SeatGeek won contracts at just a handful of MCVs: two amphitheaters and three NBA or NHL arenas. Dkt. 775 ¶¶ 15, 17. An AXS employee testified that they hadn't "won anything at the arena or stadium level in the last five years," and that they had *never* won an NHL or NBA arena from Ticketmaster. Dkt. 696-10 at 218:20–219:5, 302:25–303:4. The story isn't so rosy over at SeatGeek either. It won three contracts for NBA or NHL arenas against Ticketmaster, but one of those arenas went back to Ticketmaster just a year into the seven-year contract. Dkt. 775 ¶ 17. And when it entered the primary ticketing market, one executive testified that SeatGeek "started on soccer" arenas because "they weren't scared of the concert threat … [because] they have very little third-party content, meaning concerts." Dkt. 746-1 at 161:22–162:4. By contrast, NBA and NHL arenas are "just much, much harder to win." *Id.* at 162:25–163:7. Why? Well, the Court will review the evidence of coercion further below; and while some of it describes events from years ago, it'll be up to the jury to decide whether this conduct has persisted. Within the MCV market, the government plausibly paints a grim picture for new entrants.

That brings the Court to the explanations the government provides for this state of affairs: the alleged anticompetitive effects in the market. Live Nation challenges each of these.

### 2. Exclusive dealing

The government's first theory of anticompetitive effects is that Ticketmaster's exclusive contracts "foreclose competition." *Eastman Kodak*, 504 U.S. at 482. As a starting point, exclusive dealing agreements "can produce many procompetitive benefits." *United States v. Visa*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) (citing *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012)). For example, they may create "a strong incentive continually to improve the [quality] and prices … offer[ed] in order to secure the exclusive positions." *Balaklaw v. Lovell*, 14 F.3d 793,

799 (2d Cir. 1994). The greater the potential gain, the greater the incentive not to miss out, the story goes. Exclusive contracts may also reflect the needs of the market by "assuring steady supply, affording protection against price fluctuations, reducing selling expenses, and promoting stable, long-term business relationships." *Geneva Pharms.*, 386 F.3d at 508 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333–35 (1961)). On the other hand, they may not always be so innocent. Exclusive contracts "have the potential unreasonably to exclude competitors or new entrants from a needed supply, or to allow one supplier to deprive others of a market for their goods." *Id.* (citing *Jefferson Parish*, 466 U.S. at 45 (O'Connor, J., concurring)). The question is which role they play in this market.

The key case here is *ZF Meritor*. In that case, the Third Circuit began by observing that "[t]here is no set formula for evaluating the legality of an exclusive dealing agreement." *Id.* at 271. Then it proceeded to describe the seven factors that the parties here disagree about. It remarked that "modern antitrust law generally requires" four showings: "[1] significant market power by the defendant, [2] substantial foreclosure, [3] contracts of sufficient duration to prevent meaningful competition by rivals, [and 4] an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Id.* at 271–72. On top of that, the court then observed that "[c]ourts will also consider" two more: "[5] coercive behavior," and "[6] the ability of customers to terminate agreements." *Id.* at 272. Finally, it noted that "[7] [t]he use of exclusive dealing by competitors of the defendant is also sometimes considered." *Id.*

While this language could be clearer, it's plain that it doesn't impose seven strict requirements. It instead lays out a series of considerations, some of which take center stage. It's clear that the questions in an exclusive dealing claim are (1) whether there has been enough foreclosure to warrant an inference of anticompetitive exclusion, which is often called the prima facie case, and (2) whether there are procompetitive effects that outweigh any anticompetitive ones. Areeda & Hovenkamp ¶¶ 1821–22. That first question is principally informed by power in the relevant market, the portion of the market foreclosed, and the duration of the contracts (*ZF Meritor* factors one, two, and three). Also relevant may be any coercive behavior or the ability of customers to get out of the contracts (factors five and six). The second question is answered by the analysis of anticompetitive and procompetitive effects (factor four), which can be informed by consideration of whether competitors engage in the same behavior or whether the contracts were the product of coercion (factors five and seven). This corresponds generally to how Areeda and Hovenkamp describe the relevant considerations. Areeda & Hovenkamp ¶¶ 1821–22; *see also Microsoft*, 253 F.3d at 58–59 (describing the prima facie case of anticompetitive effects, then burden-shifting to the defendant to show procompetitive justifications, which the plaintiff can refute).[4]

---

[4] This is a familiar process under the rule of reason, which is traditionally applied to Section 1 claims. But many courts have imported Section 1's rule of reason into the analysis of anticompetitive effects from exclusive dealing under Section 2. *See, e.g.*, *Microsoft*, 253 F.3d at 59; *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 474 (7th Cir. 2020) (applying rule of reason but not naming it); *In re Mylan*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023); *see also Mid-Texas Comms. Sys. Inc. v. Am. Tel. and Tel. Co.*, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980) (noting that the analysis for exclusive dealing is virtually the same).

Importantly, no part of this analysis requires the plaintiff to show *actual* "changed prices, output, or quality," as Live Nation argues. *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 184 (2d Cir. 2016). Live Nation confuses the requirement that anticompetitive conduct "harm the competitive *process* and thereby harm consumers," *Microsoft*, 253 F.3d at 58, with a requirement that plaintiff produce evidence of actual harm to consumers through changed prices, output, or quality. The *MacDermid* decision that Live Nation relies on examined a situation in which an antitrust plaintiff was unable to articulate any compelling theory of anticompetitive effects. *MacDermid*, 833 F.3d at 186–87. While it noted that the Second Circuit had "never had occasion to determine in a precedential opinion" that a rule of reason challenge passed muster without a showing of changed prices or output, it certainly didn't hold that it isn't possible. *Id.* at 183. It ultimately endorsed a conventional rule: "a plaintiff may demonstrate an adverse effect indirectly by establishing that the alleged conspirators had sufficient market power to cause an adverse effect, plus some other ground for believing that the challenged behavior has harmed competition." *Id.* at 182 (quotation omitted). Indeed, the caselaw understands harm to the competitive process to *be* harm to consumers. *See Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 492 n.4 (S.D.N.Y. 1992) ("The antitrust laws are concerned with the competitive process.... A healthy and unimpaired competitive process is presumed to be in the consumer interest." (cleaned up) (quoting *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986)).

With that, the Court turns to the factors laid out in *ZF Meritor*, beginning with those that would support an inference of anticompetitive effects. Together, these suggest a genuine dispute of material fact exists about anticompetitive effects by virtue of exclusive dealing.

*Market power.* According to the government's calculations, Ticketmaster has high market share in the markets for primary ticketing (75%) and for primary concert ticketing (86%) at MCVs. Dkt. 717-1 ¶ 16. Live Nation doesn't contest that. "[A] market share of over 70 percent is usually strong evidence of monopoly power." *Tops Mkts., Inc. v.  Qual. Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998).

*Substantial foreclosure.* Many of Ticketmaster's contracts with venues include some sort of exclusivity provision. Hill calculates that 65% of MCVs have exclusive contracts with Ticketmaster. Dkt. 717-1 ¶ 372. One example of these provisions grants Ticketmaster the right "to be the exclusive seller … of all Tickets … for every" "concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held" at the venue. Dkt. 758-15 ¶¶ 2a, 16. Live Nation contests this characterization. It argues that not every "exclusive" contract covers 100% of primary ticketing revenue. Dkt. 690 ¶ 24. And as discussed earlier, at least some contracts include "carveouts." Dkt. 717-1 ¶ 57.

That may be true, but these contracts plainly prohibit other deals to a substantial degree—enough, according to one of Live Nation's experts, to justify large up-front payments in exchange for this right. Dkt. 791-2 ¶ 61. On top of that, this 65% figure looks only at venues at which *100%* of the events hosted in 2024 were ticketed by Ticketmaster. Dkt. 717-1 ¶ 372 n.800. When that threshold is dropped to 95% to accommodate carveouts, 71% of MCVs appear to be exclusively ticketed. *Id.* ¶ 460. In any event, "[e]xclusivity need be neither express nor complete to render an

agreement exclusive for Section 2 purposes: De facto and partial exclusivity may suffice depending on the circumstances." *Reiss v. Audible, Inc.*, 2025 WL 1654643, at *8 (S.D.N.Y. June 11, 2025) (quoting *United States v. Google*, 747 F. Supp. 3d 1, 146 (D.D.C. 2024)). And "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Microsoft*, 253 F.3d at 70.

Live Nation's other argument against foreclosure fails. Relying on a nearly three-decade old Ninth Circuit case, it argues that the market for foreclosure should be analyzed more broadly than the relevant antitrust market. *See Omega Envtl. v. Gilbarco*, 127 F.3d 1157, 1163 (9th Cir. 1997). But this misreads the Ninth Circuit's decision. The Ninth Circuit rejected the plaintiff's gambit to narrow the market further than the relevant antitrust market, instead holding that the right denominator for the foreclosure calculation is "the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for." *Id.* at 1162. That would be the *whole* relevant antitrust market, not less or more. Live Nation's reliance on this case is misplaced because it argues that the Court should analyze a market *broader* than the relevant antitrust market.

*Contract duration.* On average, the contracts are around 5.6 years long, according to Hill. Dkt. 717-2 ¶ 370. Live Nation's expert calculates the number a bit lower (4.1 years), Dkt. 791-3 ¶ 69. Live Nation doesn't present arguments explaining why its expert's calculation should be preferred—but in any case, durations of "two or three years, with opportunities for renewal … can raise antitrust concerns," and can do so even when they "foreclose 19.4% of the market." *Google*, 747 F. Supp. 3d at 158. Here, the Court also notes that the contracts in the record have limited rights of termination for the venue or require payment of termination fees, compounding their restrictiveness. Dkts. 750-3 §§ 13.1, 13.2, 13.4, 13.5; 751-20 § 3(d); *ZF Meritor*, 696 F.3d at 287.

Putting that together, the evidence arguably gives rise to a strong inference of anticompetitive effects. Upward of 70% of Ticketmaster's contracts have an exclusivity provision, and it has substantial share in the market—between 75% and 86% of tickets sold. Dkt. 717-1 ¶ 16. Of course, the portion of tickets sold differs from the number of venue contracts won, but it's likely indicative. And taken together these numbers create a genuine dispute of material fact that upwards of 50% of the market is foreclosed. "Percentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration." Areeda & Hovenkamp ¶ 1821c. "When the numbers are large enough to be threatening, they establish an inference of prima facie illegality, thus shifting the burden to the defendant to show that exclusive dealing is justified under the circumstances." *Id.* That means that Live Nation must be able to show that there's no genuine dispute of material fact that its exclusive contracts have procompetitive effects that outweigh the anticompetitive ones.

*Anticompetitive and procompetitive effects.* The thrust of Live Nation's argument is that this exclusive contracting is a normal and procompetitive practice in this market. It argues that the venues want these contracts, which is evidenced by a lack of coercion (a *ZF Meritor* factor) and by Ticketmaster's competitors also using exclusive contracts (another factor). Dkt. 689 at 24–25.

On this story, the market is highly competitive: Ticketers submit bids for exclusive contracts and venues pick the most favorable one of the bunch. The Court takes these arguments in turn.

*First*, competition for the contracts isn't dispositive. Live Nation relies on three cases for this proposition. The first is *Spinelli v. NFL*, a district court case that appears to rest on the notion that a bidding process for exclusive contracts means that they are "not anticompetitive as a matter of law." 96 F. Supp. 3d 81, 118 (S.D.N.Y. 2015). The *Spinelli* court dismissed a complaint alleging exclusive dealing where it "plainly allege[d] competition to obtain the exclusive contract and that the exclusive licenses … were of limited duration." *Id.* To reach that conclusion, it incorrectly read a Sixth Circuit decision to stand for that broad legal proposition. Upon closer reading, that Sixth Circuit decision explicitly rested on the failure of the plaintiffs to make specific showings about anticompetitive effects outweighing procompetitive effects. *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977–78 (6th Cir. 2000) ("[Plaintiff] has failed to allege how such acts have injured competition."). The Court declines Live Nation's invitation to follow *Spinelli* in reading a per se legal rule into a fact- and presentation- bound out-of-circuit holding.

Next, Live Nation cites another district court opinion, *Ticketmaster Corp. v. Tickets.com, Inc.*, for the proposition that a bidding process can be dispositive in this analysis and that—in this specific context—venues prefer longer term contracts. 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003). *Tickets.com* doesn't support this proposition for two reasons. The first is that the district court's analysis was guided by Ninth Circuit precedent holding that exclusive dealing is analyzed for whether it's "commercially reasonable." *Id.* at *5. Live Nation doesn't allege that the Second Circuit has any analogous test. But more importantly, this decision doesn't establish any per se rule but instead walks through much of the same contextual analysis that the Court would consider here as well. That includes whether exclusive contracts are a common market practice and whether they're coerced. *Id.* at *5–6. Finally, Live Nation relies on a nearly four-decade-old Ninth Circuit decision, *Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 982 (9th Cir. 1988). This case examined a *single* contract, noted that it would be up again for bidding in six years' time, and so didn't pose a competitive harm. *Id.* That differs meaningfully from the government's allegations in this case, which involve an alleged monopolist using a slate of exclusive contracts to block out new entrants. Importantly, the Court notes that the RFP process between venues and ticketers isn't blind. That opens it up for the possibility of coercion, tainting the bidding process.

*Second*, there is evidence of coercion. To support that, the government points to specific instances in which Ticketmaster appears to have threatened venues by conditioning access to artists on the venues picking Ticketmaster as the ticketer. *See, e.g.*, Dkts. 752-1 at 2 (sworn affidavit that venue executive was told by Ticketmaster executive that "if Ticketmaster was not directly awarded the ticketing contract, then Live Nation would divert concerts to other venues in the area, resulting in fewer Live Nation concerts at [the venue.]"); 695-8 at 29:4–8, 29:14–17, 29:21–24 (testimony from a different venue executive that a "senior person at Ticketmaster" told him that the venue "would probably never see a Live Nation show if [they] were a SeatGeek building," informing his "understanding … that they would punish us for not using Ticketmaster"); 835-6 at 2 (internal

Ticketmaster email discussing the prior exchange asking "Where is [deponent] getting the impression that LN will continue to want to bring content if TM isn't in the venue?"); 694-4 at 40:24–41:3, 43:25–44:1 ("A: We were told that if we chose a different ticketing partner that the possibility of concerts moving to a different venue was a distinct possibility or a realistic possibility that we should consider… Q: Did you consider this statement a threat? A: Yes."). The government also points to "make good" clauses in contracts between SeatGeek and some venues, in which SeatGeek has agreed to pay the venue if Live Nation retaliates against them, providing further evidence of coercion (which is explained more a bit further below).  Dkts. 693-7 at 18; 693-8 at 12; 760-4 at 20; 837-5 at 7.

Live Nation argues that this evidence lacks proper context or should be interpreted differently. Its story is that its competitors' services are simply worse, that it wouldn't want anything but the best for its shows, and that these executives simply misunderstood what was being communicated. *See, e.g.*, Dkt. 799 ¶¶ 41–42. But that simply goes to a genuine dispute of material fact for a jury to decide. Similarly, although Live Nation argues that these threats aren't specific to exclusivity, a jury could find that it was understood that going with Live Nation meant going with an exclusive deal.

*Third*, there's a genuine dispute of material fact about whether the preferred market practice is to use long-term exclusive contracts. Live Nation's argument is that this is a pretty good model for venues, and one that they want. To support that, there's lots of evidence that venues often prefer this arrangement because it generates greater fees or because it's operationally simpler. Dkts. 695-14 at 110:17–111:3 ("Q: And just so I understand, the decision … to switch from open ticketing to an exclusive ticketing model ... [was] to allow [the] venues to participate and receive a percentage of the service charges? A: That and, again, to have consistency with the ticket sales for our venues."); 695-16 at 56:19–57:2 ("Q: Is it [the venue's] preference to have an exclusive relationship with its primary ticketer? A: Yes…[because] [t]o operate under different systems … would be very burdensome."); 695-17 at 164:6–7 ("Our ticket and sales folks, our box office, was concerned about [using more than one primary ticketer], they thought that we do a good amount of cross-selling between our hockey fans and our concerts fans so trying to go back and forth between providers, it would be difficult."); 695-31 at 50:22–51:3 ("Q: Do you prefer having an exclusive ticketer…? A: That is—you know, that is the standard expectation in the industry. So yes, we would prefer [it] for ease of usage for our customers, for our promoters.").

Against that, the government argues that these exclusive contracts were used for foreclosure, not because they're what the venues wanted. It points to deposition testimony given by an employee at one of Ticketmaster's competitors (which also has a venue management arm) who testified that it "would have loved to have had" all its venues exclusively use its own ticketer, but didn't because "the content threat" from Live Nation "is very real and very effective." Dkt. 695-11 at 36:15–20. While on the surface this might be taken to reinforce the preference for exclusive ticketing (just not with Ticketmaster), the reference to coercion could be understood to suggest that Ticketmaster is holding off any real competition—even for exclusive ticketing deals—with its coercive arrangements, which is further supported by other ticketers having to include make good

clauses in their deals. Taking all this together, a jury must decide whether the exclusive contracts are the product of coercion (as there's some evidence for) or venue preference (as there's some evidence for).

There is a genuine dispute of material fact as to whether Live Nation has used monopoly power to foreclose competition.

### 3.  Raising-rivals'-costs theory of harm

The government's next theory of anticompetitive harm in the ticketing markets is that Ticketmaster raised costs for its rivals "sufficiently to prevent them growing into effective competitors." Dkt. 755 at 32 (quoting *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015)). Under this theory, Ticketmaster's retaliatory threats against venues create an implicit *cost* for other primary ticketers. By threatening venues, Ticketmaster might create the impression that any deal with a rival ticketer would be less profitable for the venue. Rival ticketers would have to sweeten the deal to stay competitive, raising their cost of doing business and potentially allowing Ticketmaster to charge supracompetitive prices to venues. Areeda & Hovenkamp ¶ 1804. The government relies on an Eleventh Circuit decision that endorsed this theory. *See McWane, Inc.*, 783 F.3d at 832.

But, Live Nation asks, where's the evidence? The government points to the use of "make-good" clauses in some contracts offered by SeatGeek. A make-good provision entitles the venue to payment from SeatGeek "if they see fewer shows as a result of moving to SeatGeek because of punishment from Live Nation." Dkt. 746-1 at 165:4–6. It appears that this kind of clause isn't in all of SeatGeek's primary ticketing contracts—"Just some." *Id.* at 165:13. The government identifies four contracts that discuss what happens if Live Nation retaliates against the venue. *See* Dkts. 693-7 at 18; 693-8 at 12; 760-4 at 20; 837-5 at 7. The decision whether to offer that clause is "driven by how much the venue … [is] worried about it," and how much SeatGeek "can stomach the potential exposure," according to a SeatGeek executive. Dkt. 746-1 at 165:18–166:2. At the time that he was deposed, this SeatGeek executive "expect[ed] … to pay out" on a contract at a specific venue and was "trying to nail down the exact amount." *Id.* at 167:22–24. In another instance, after what may have been retaliation, a venue "sent a letter reserving their rights to collect on a make-good, but due to the positive relationship … ha[dn't] yet collected on that." *Id.* at 168:7–11.

Live Nation offers three arguments against this theory of harm. Each fails. The first is that no evidence shows that SeatGeek *has* paid out on any of these clauses. That may be true, but the already-discussed evidence suggests that SeatGeek nonetheless had to adapt its business strategy to stand behind this commitment, and other evidence suggests that venues themselves modeled the "[p]otential loss of Live Nation shows" from "moving [their] ticketing provider" from Ticketmaster to another provider. Dkt 754-1 at 2; *see also* Dkt. 696-17 at 79:18–81:4 (discussing calculations made by a venue to model potential losses based on other venues that had switched from Ticketmaster). Taken together, this suggests there's a genuine dispute of material fact about whether the threats disadvantaged SeatGeek and other competitors in the market by implicitly raising their costs.

Live Nation's second argument is that these clauses weren't included as hedges against Live Nation's threats but instead as hedges against SeatGeek doing a bad job with ticketing. This argument is plainly contradicted by the language of these contracts, which calls out Live Nation by name—but, in any case, what motivated these contracts is a question for the jury.

Live Nation's final argument is that the government has failed to satisfy a latent causation requirement in Section 2 linking any injury to the challenged conduct, citing *Natsource v. GFI Grp.*, 332 F. Supp. 2d 626, 637 (S.D.N.Y. 2004). This seems to be another version of Live Nation's argument that to make out a Section 2 claim, a plaintiff is required to show changed prices, reduced output, or inferior quality. That's wrong as discussed above, and *Natsource* certainly doesn't support any such requirement. *Natsource* simply emphasizes that to make out a claim, there must be either harm to consumers or "the potential to harm consumers," *id.*, which of course can be shown through evidence of harm to the competitive process.

### 4. *Additional scale-related arguments*

Because the Court has already denied summary judgment on the government's Section 2 theory in this market on two different grounds, it doesn't reach the final—very lightly briefed—theory that there's an independent theory of harm from Live Nation's economies of scale creating moats that further entrench its monopoly. Dkt. 755 at 31.

As there are triable issues of fact on all elements of the government's Section 2 claim in the venue-facing primary ticketing market, Live Nation's motion for summary judgment on this claim is denied.

## VI.    Section 1 claims

### A.  Exclusive dealing in the venue-facing primary ticketing market

The Section 1 analysis for exclusive dealing in this market by and large follows the Section 2 analysis. But there's one wrinkle. Live Nation argues that Section 1 exclusive-dealing challenges can't "aggregate contracts as is allowed under Section 2." Dkt. 689 at 32. This argument is misguided. It relies on a series of cases in which courts purportedly analyzed each contract subject to a Section 1 claim *separately* rather than together to assess foreclosure. *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002); *Howard Hess Dental Lab'ys. v. Dentsply Int.*, 602 F.3d 239 (3d Cir. 2010); *Panini America v. Fanatics*, 2025 WL 753954 (S.D.N.Y. Mar. 10, 2025); *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069 (9th Cir. 2025). But these cases don't stand for the principle that a court can't consider the cumulative effect of foreclosure from multiple contracts on a Section 1 claim. Each of the cited cases is inapposite because each is a conspiracy case in which a plaintiff sued both the "hub" of the conspiracy as well as its counterparties that made up its "spokes." *Dickson*, 309 F.3d at 203; *Howard Hess*, 602 F.3d at 255; *Panini America*, 2025 WL 753953, at *9; *Gibson*, 148 F.4th at 1087. Of course, each spoke would have made up only a small portion of the total market foreclosed by the exclusive dealing. So, to bring them in as defendants, plaintiffs argued that defendants were part of a "rimless wheel" conspiracy. Under that theory, their contracts should be all added together with the activity of the "hub." Each of these courts

rejected that as a distortion of the law of conspiracy, which requires a horizontal agreement (a "rim") to link up the spokes. That's different from this case, in which only the "hub" is being sued, and the allegation is that the hub *by itself* foreclosed a large share of the market by its exclusive dealing.

To endorse Live Nation's argument for all Section 1 claims would be a coup for antitrust defendants. Section 1 exclusive dealing claims would become virtually impossible to bring, as the anticompetitive effect of any individual contract would be minimal except for in the most extreme cases. Indeed, the Supreme Court itself has aggregated contracts in its Section 1 analysis. *See, e.g.*, *Standard Oil Co. of California v. United States*, 337 U.S. 293, 295 (1949).

### B. Tying

Live Nation doesn't specify whether its summary-judgment challenges to the government's tying allegations apply to Section 1, Section 2, or both. The Court understands them to be a broadside attack on tying as brought under either part of the statute. And, because the Court has already dealt with those arguments, the government's Section 1 tying claim also may proceed to trial.

## VII.    There's a triable question of fact on antitrust injury

What remains in this case are the government's claims in the venue-facing ticketing market. Live Nation has challenged whether the state plaintiffs have standing to sue for damages suffered by consumers due to Live Nation's conduct in this market. At the summary-judgment hearing in this case, Live Nation agreed that the sole issue for this Court to decide is whether there is a triable question of fact as to whether those consumers suffered a cognizable antitrust injury. Hearing Tr. 9:13–18; 10:16–22.

Live Nation argues that consumers—fans who purchase tickets on Ticketmaster—don't suffer a cognizable injury because they don't participate in the market for primary-ticket services, where venues are the customers and Ticketmaster is the seller of these services. Indeed, as Live Nation observes, while fans may buy tickets, that's distinct from the ticketing services at the heart of the government's claim in the venue-facing ticketing market. But for purposes of this motion, Live Nation doesn't contest that fans purchasing tickets from Ticketmaster may suffer the downstream consequences of any violation in the ticketing-services market, which could take the form of fewer shows, worse services, or higher fees (among other possibilities). Dkt. 717-1 ¶¶ 20, 370.

For that reason, Live Nation's argument runs headlong into the Supreme Court's decision in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), where the Court made clear that a plaintiff doesn't need to be a direct participant in a market to have an antitrust injury, as long as they are "within that area of the economy endangered by that breakdown of competitive conditions" resulting from upstream anticompetitive conduct. *Id.* at 480–81 (cleaned up). In *McCready*, the anticompetitive conduct involved psychiatrists and a prepaid health plan. *Id.* at 467–69. The health plan had allegedly conspired with the psychiatrists to prevent psychologists from being eligible for compensation. *Id.* at 470. The result was that Katherine McCready, a patient of a psychologist, couldn't get her bills reimbursed. *Id.* The immediate victims in the relevant market—i.e., between

healthcare professionals and health plans—were the psychologists. But McCready nonetheless had antitrust standing. The Supreme Court held that "the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market," but instead must allow McCready, whose "harm was clearly foreseeable," to sue. *Id.* at 479. *McCready* is on all fours with this case. The market between healthcare professionals and plans is just like the market between venues and ticketers here. And McCready, who was a downstream customer, was a reasonably foreseeable victim, just like the fans are here.

Live Nation's argument to the contrary relies on *In re Aluminum Warehousing*, 833 F.3d 151 (2d Cir. 2016). True, in *Aluminum Warehousing* the Second Circuit held that there must be a close connection between the antitrust violation and the injury in another market. There, the Court held that downstream purchasers of products whose prices were affected by the defendants' alleged conduct lacked antitrust standing. *Id.* at 161–62. In reaching this holding, the Court observed that "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *Id.* at 161.

But the Second Circuit didn't hold that the only market that is "directly restrained" is the one in which the antitrust violation occurs, nor could it without deviating from *McCready*. The "market that is directly restrained," by its logic, can include the one directly downstream, just like in *McCready* and just like in the Second Circuit's decision in *Crimpers Promotions Inc. v. Home Box Off., Inc.*, 724 F.2d 290 (2d Cir. 1983); *see Aluminum Warehousing*, 833 F.3d at 159–61 (citing *McCready*). Plus, *Aluminum Warehousing* presented a different set of facts where the claim of antitrust injury was far more attenuated. There, the plaintiffs had "disavow[ed] participation in any of the markets in which defendants operate[d]," had no other contract with the defendants, and their claim of injury was based solely on the contention that prices of "their purchases of aluminum and aluminum products on the physical aluminum market" were affected by the defendants' conduct. *Id.* at 162.

Here, the fans directly interact with Ticketmaster. That's how they buy the tickets that are at the heart of this case. The government argues that a lack of competition between ticketers creates worse outcomes for fans, for example through worse service or higher fees. That's the "fulcrum," Hearing Tr. at 17:20–21, that Live Nation is looking for between the antitrust violation and the injury to fans. Just as in *McCready*, excluding medical professionals (the anticompetitive conduct) injured downstream consumers of the defendant by reducing choice, so too here would foreclosing the market with exclusive contracts (the anticompetitive conduct) injure Ticketmaster's customers by reducing choice and any benefits that might accompany it.

The fans have a triable issue about antitrust injury, so Live Nation's antitrust-injury challenge falls flat.

## VIII.    Some of the state claims proceed to trial

Along with the Sherman Act claims, the government brought a dizzying array of state claims (for ease of discussion here, "state" also includes the District of Columbia). Live Nation moved for summary judgment on the Sherman Act claims, and in a single sentence of its brief mentions

that it also is moving for summary judgment on the state claims and that "numerous states have enacted provisions harmonizing their antitrust statutes with the Sherman Act." Dkt. 689 at 36 n.7. In short, Live Nation says that the state claims should fail for the same reasons as the federal claims. The government responds that Live Nation is wrong, and that several of the state claims don't have anything to do with the technical antitrust arguments raised on Live Nation's motion. *See* Dkt. 755 at 41 n.9 (citing Neb. Rev. Stat. §§ 56-1602 *et seq.*, the California UCL, and other state laws).

Whether these allegedly unique claims raise triable issues of fact isn't a dispute that the Court can decide based on the parties' battle of the footnotes. That's why the Court suggested at the summary-judgment hearing that the parties should consider staying those claims to be addressed at a later date. But after the hearing, the Court was convinced by the states' submission that argued against this approach and which noted that staying these claims would be inequitable and inefficient, Dkt. 973, and would simply reward Live Nation for having relegated these claims to a footnote.

What is clear is that some of the claims pressed by the states rise and fall on the same grounds as the federal ones, meaning that some will be in and some will be out based on this Court's decision. To the extent there are others that don't fit that mold, they can't be dismissed based on Live Nation's anemic state-law arguments. This may be an issue that can be addressed in connection with the instructions and verdict form to be provided to the jury. At the final pretrial conference, the Court will address the procedures concerning the state-law claims for purposes of the upcoming trial.

## CONCLUSION

For the foregoing reasons, Live Nation's motion for summary judgment is GRANTED in part and DENIED in part. Here's what will proceed to trial: (1) the government's claims concerning the artist-facing amphitheater market; (2) its claims concerning the venue-facing primary ticketing market (including the state plaintiffs' claim for damages); and (3) the state claims that aren't subject to dismissal based on the resolution of the federal claims. Live Nation's motion to exclude the testimony of Dr. Nicholas Hill is GRANTED in part.

The Clerk of Court is directed to terminate Dkt. 688.


SO ORDERED.

Dated: February 18, 2026
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge